EXHIBIT 2

# In The Matter Of:

*WILL EL, ET AL. v.*
*CITY OF PITTSBURGH, ET AL.*

---

*BEYSHAUD EL*
*November 6, 2017*

---

*AA COURT REPORTERS*
*412.288.5370*

Original File ELBEYSHAUD-110617.txt
**Min-U-Script® with Word Index**

1  Q.     So, that's pretty difficult work; right?
2  A.     No.  I like it.  I like to work out, so if I
3  can't work out in the morning or in a day, I try to do
4  something to where I'm lifting stuff to where I could
5  keep my body moving.
6  Q.     So, it required a lot of lifting and a lot of
7  carrying; correct?
8  A.     Yes.
9  Q.     When did you first start working for Ikea?
10 A.     I may have -- the beginning of 2016.
11 Q.     Okay.  And how long did you work for Ikea?
12 A.     It wasn't long at all.  My same contractor I had
13 at Mattress Firm had a contract at Ikea, EXP Logistics
14 and Best Buy.  So, I was working for the same
15 contractor.
16 Q.     So, you were with the same contractor you were
17 working with for Mattress Firm you were also working
18 with for Ikea?
19 A.     Yes, ma'am.
20 Q.     So, your understanding of why you were fired
21 from working with Ikea is the same reason why you were
22 fired from working with Mattress Firm?
23 A.     Yes, ma'am.
24 Q.     Because it was the same contractor?
25 A.     Yes.

1  Q.      And have you since been hired back at Ikea?
2  A.      No.  I haven't tried to go back.  I like
3  Mattress Firm a little better.  Everything is a little
4  heavier.  It's a little bigger.
5  Q.      It's a little heavier and bigger at Mattress
6  Firm?
7  A.      Yes.  From king mattresses to adjustable bases.
8  We get in tight spots where you'll have a customer
9  saying what are you doing with my mattress.  I have to
10 bend it for it to go up the steps.  You're in an
11 apartment and you're getting a $5,000 bed.  I don't
12 understand it.  It's a lot of struggling.
13 Q.      And then you had mentioned, I believe, Logistics
14 SPO; is that correct?
15 A.      Yes.  That's also more of a show up and drop off
16 the boxes.
17 Q.      Okay.
18 A.      It doesn't matter if anyone's home or anything.
19 You just -- they tell you to make sure you put it to
20 where a random person driving past or walking past can't
21 see it.  So, if they have flowers or something on the
22 porch, put the box behind the flower pot and write on
23 the paperwork I put box behind flowerpot just in case
24 the customer does come home or is on the way home and
25 wants to know if the merchandise is dropped off, they'll

1  be assured it was dropped off by our warehouse guy
2  sitting there.
3  Q.      And that's the same contractor as the contractor
4  you worked with for Ikea and Mattress Firm?
5  A.      Yes.  That was the same contractor.
6  Q.      How long did you work for Logistics SPO?
7  A.      Not long, either.  It was when I couldn't get a
8  day at Mattress Firm, I would go over there.  So, it was
9  more of like a ping-pong.
10 Q.      Now, did you get fired from Logistics SPO, too?
11 A.      No, I didn't.
12 Q.      Okay.  Do you know how long you worked with
13 Logistics SPO?
14 A.      I don't know.
15 Q.      And you don't work there currently; is that
16 correct?
17 A.      No, ma'am.
18 Q.      Okay.  Why did you quit working with Logistics?
19 A.      Mattress Firm is just a better job for me.
20 Again, I like to lift things.  I'm serious.  So, if my
21 job doesn't consist on lifting anything, I'm really not
22 interested.
23 Q.      Okay.
24 A.      Because I'm skipping out on my morning workout
25 to come to work anyways.  Got to be something here for

1  me to do to keep moving, stay busy.
2  Q.     Okay.  Are you full-time with Mattress Firm or
3  are you part-time?
4  A.     Yes.  I am full-time.  I'm currently getting
5  four days.  I was currently getting four days up until
6  this Saturday, our contractor Jason -- he's an
7  out-of-town guy -- he said he was letting his contract
8  go because they wasn't receiving enough money.  He only
9  had one truck in the warehouse.  I'm now about to be
10 working for a guy named Fred.
11 Q.     So, you'll move to a different contractor named
12 Fred?
13 A.     Yes.
14 Q.     And that will allow you to keep working with
15 Mattress Firm?
16 A.     Yes.  And there, I'll be getting five to
17 six days instead of four.
18 Q.     Okay.  Now, you had mentioned Best Buy.  Tell me
19 about Best Buy.
20 A.     It was the same.
21 Q.     Okay.
22 A.     It was combined with Ikea.  So, when we went to
23 Ikea in Robinson, we would go to the other Ikea that was
24 way over here.  Mind you, we're starting work at five in
25 the morning.  There's two docks.  So, you'll be waiting

22

1  July 2, 2013.  Starting with going into the One Stop,
2  please tell me what happened to you on that day.
3  A.      Before going inside of the store, we noticed a
4  police car directly across the street parked up on the
5  curb just sitting there, had no lights on or anything.
6  We walked into the store.  Coming out, it was still
7  parked right there.
8          As we were walking up Homewood Avenue proceeding
9  to go home, the cop car was pulling up on the side of
10 our left side and she had asked if she can speak with
11 us.  We said no.  We proceeded to walk home.  She, then,
12 parked her vehicle when we were walking across the
13 street.  Then she had reversed her vehicle pulling up on
14 our right side which is the opposite driver's side on
15 the street.
16         She then got out of her car asking my brother
17 for his identification.  While he was giving her his
18 identification, he asked me to empty my pockets.  I
19 emptied my pockets.  She then asked us to sit on the
20 ground.  Although we didn't do anything, we still
21 listened to her.
22         While we were sitting on the ground, she had
23 picked up my brother's license.  After dropping it on
24 the ground, I went to pick it up.  She had stepped on it
25 which had made me feel like less of a man.  We didn't do

24

1  A.     No, I didn't.
2  Q.     Did you purchase anything in the One Stop?
3  A.     Yes, I did.
4  Q.     What did you purchase?
5  A.     A Dutch Palma.
6  Q.     I'm sorry.  What is that?
7  A.     A Dutch Palma.
8  Q.     What is that?
9  A.     It's a cigar and a cigarette.
10 Q.     A cigarette or a pack of cigarettes?
11 A.     A cigarette.
12 Q.     And when your brother told you to empty your
13 pockets, you did that; right?
14 A.     Yes.
15 Q.     What all was in your pockets?
16 A.     My keys, a lighter and my Carmex.  Those are the
17 things that I keep all the time, so that's what I'm
18 going to initially say.
19 Q.     Okay.
20 A.     Maybe my cell phone, also.
21 Q.     What about the cigar and the cigarette you
22 purchased?
23 A.     Those were in my hand.
24 Q.     Okay.  Both -- that's two items; right?
25 A.     Yes.

1  Q.    So, those were both in your hand at the time?
2  A.    Yes.
3  Q.    So, you held onto those?
4  A.    Yes.
5  Q.    Okay.  Now, did you say anything to the police
6  besides your initial telling them that you weren't going
7  to stop and talking to Lieutenant Kacsuta?  Did you say
8  anything else to the police?
9  A.    Not at that time.
10 Q.    And when you say not at that time, what do you
11 mean?
12 A.    When everything had escalated, I remember saying
13 like this is harassment, this is bull crap, and that's
14 it.
15 Q.    And were you directing those statements to any
16 officer in particular?
17 A.    I was just speaking out loud on the whole
18 situation itself.
19 Q.    Okay.
20 A.    I didn't understand what was going on.
21 Q.    And did you hear your brother saying anything to
22 the police?
23 A.    No, after talking, speaking with Officer
24 Kacsuta.
25 Q.    You heard your brother speaking with Officer

1  Kacsuta?
2  A.     That's when he was telling her this was
3  harassment and right before Officer Welling slammed him
4  to the ground by his neck.
5  Q.     And after your brother was, to quote you,
6  slammed to the ground by his neck, did you hear him say
7  anything else?
8  A.     No.
9  Q.     Now, you're aware your brother was deposed this
10 morning; correct?
11 A.     Yes.
12 Q.     And have you talked to him since his deposition?
13 A.     No, ma'am.
14 Q.     And besides your attorney, have you spoken to
15 anyone else this morning about this case?
16 A.     No, ma'am.
17 Q.     Are you aware there's a dash cam video of this
18 incident?
19 A.     Yes, ma'am.
20 Q.     Have you seen that video?
21 A.     Yes, ma'am.
22 Q.     How many times have you seen that video?
23 A.     I basically watch it all the time.  It's been
24 compared to another incident I recall, two brothers
25 inside of a store being attacked by two officers.  So,

Case 2:15-cv-00834-NBF   Document 109-2   Filed 01/19/18   Page 10 of 17

AA COURT REPORTERS  412-288-5370

27

1  it's always talked about when I get around my friends.
2  Q.     And do you know what area -- was that other
3  incident in the City of Pittsburgh?
4  A.     No, it wasn't.
5  Q.     Do you know where that other incident took
6  place, the other two brothers in the store?
7  A.     I can't recall, but it struck a nerve with me
8  watching it as it does with me even sitting here
9  reliving it just to tell you what had occurred that day.
10 Q.     Okay.  Now, did Lieutenant Kacsuta ever put her
11 hands on you?
12 A.     No.
13 Q.     So, why did you stand up from a seated position?
14        MR. HOLLIS:  Objection.  At what point?
15 BY MS. CRESSLER:
16 Q.     So, during the incident, do you recall standing
17 up at any time during the incident?
18 A.     Yes.
19 Q.     How many times?
20 A.     Once.
21 Q.     And why did you stand?
22 A.     I felt as though we -- honestly, it was time to
23 leave.  We've been sitting there for a long time.  We
24 didn't do anything wrong.  We were sitting on the
25 ground.  I honestly didn't know what was going on.

1  Q.      And did you see Officer Welling put his hand on
2  your brother?
3  A.      Yes.
4  Q.      And did you physically make contact with Officer
5  Welling?
6  A.      No.  Not initially.
7  Q.      Okay.  And when you say not initially, what do
8  you mean?
9  A.      As I had gotten up off the ground, he was
10 putting his hand on my chest.
11 Q.      Officer Welling was putting his hand on your
12 chest?
13 A.      Yes.
14 Q.      And then what happened?
15 A.      I had removed it from my chest.  I didn't try to
16 grab it, yank him, push him, hit him or anything.  I
17 just removed his hand off of my chest.
18 Q.      So, at that point in time, you did touch his
19 hand with your hand; is that correct?
20 A.      Yes.  More so of like his wrist.
21 Q.      Okay.  So, you touched his wrist.  And was your
22 hand open?  It was an open hand?
23 A.      Yes.
24 Q.      And, so, then, at some point after you touched
25 Officer Welling, you were tazed; is that correct?

1   A.     Yes.
2   Q.     Was that in processing or intake or -- they
3   might even be the same thing.
4   A.     I don't know, neither.  I've never been in jail.
5   Q.     Okay.
6   A.     That's why I'm looking at you crazy, too.  I'm
7   trying to figure out what process it is.
8   Q.     Okay.
9   A.     But, however it's whenever you get straight down
10  there and they do a fingerprint on you and then you're
11  in this other type of room where it looks as if there
12  were phones there and you're talking to someone right
13  there getting your information.  He's trying to see
14  someone for you to call or something.
15  Q.     Okay.  And that's when you saw your brother
16  again?
17  A.     Yes.
18  Q.     And how long, approximately, were you at the
19  Allegheny County Jail?
20  A.     Day.
21  Q.     And were you released at the same time as your
22  brother?
23  A.     Yes.
24  Q.     And where did you go after you were released
25  from the jail?

1  don't trust psychiatrists?
2  A.     I don't trust the old sitting in the room
3  talking to somebody.  I don't -- I don't really see what
4  that does.
5  Q.     Okay.  Besides the two marks on your body where
6  the tazer prongs made contact and where you hit your
7  head, the back of your head, did you sustain any other
8  injuries?
9  A.     No.
10 Q.     Prior to this incident, twenty-four hours prior
11 to this incident on July 2nd, 2013, had you consumed any
12 drugs?  And that includes marijuana.
13 A.     Yes.  Marijuana.
14 Q.     And when had you used marijuana?
15 A.     Probably that night.
16 Q.     Okay.  Are you currently using marijuana?
17 A.     Yes, I am.
18 Q.     And how often would you say you use marijuana?
19 A.     Occasionally.  Birthdays.
20 Q.     When was the last time prior to today that you
21 used marijuana?
22 A.     Like September -- what date did -- 22nd, 21st.
23 Q.     Why does that date stick out in your mind?
24 A.     It was a birthday.  Friend of mine's friend.
25 Q.     Besides this lawsuit, have you ever been a party

1 to a civil lawsuit or either a plaintiff or a defendant?
2 A. No, ma'am.
3 Q. And are you currently on disability or Workers'
4 Compensation?
5 A. No, ma'am.
6 Q. Have you ever received Workers' Compensation
7 payments?
8 A. No, ma'am.
9 Q. How many times, besides the time when the
10 officers took you, did you go to the hospital for the
11 injuries you sustained on July 2nd, 2013?
12 A. One time.
13 Q. And did you ever follow up with like a primary
14 care physician about those injuries?
15 A. No.
16 Q. Did anyone ever choke you during this July 2nd
17 incident?
18 A. No, ma'am.
19 Q. Where are you currently living?
20 A. 7013 Hermitage Street.
21 Q. And is that the same address you were living at
22 when this incident occurred?
23 A. Yes.
24 Q. Who do you live with there now?
25 A. My brother.

43

1  account, it could be by somebody else?
2  A.     No.  As far as posts, those are my things.
3  Q.     Okay.
4  A.     But as far as like looking through my messages
5  or something, that's a female.
6  Q.     As far as you know, any post that is made by the
7  account is by you?
8  A.     Yes.
9  Q.     Do you have any other social media accounts?
10 A.     Yes.  Instagram and Snapchat.  However, I don't
11 frequently get on there how I get on my Facebook.
12 Q.     Do you know what the user names are?
13 A.     If it isn't Pushup Shaud, it should be Shaud.
14 Yeah.  That's it.
15 Q.     Do you have any other -- did you have a Facebook
16 account under the name Beyshaud El at some point?
17 A.     I believe so, in middle school, but, however, I
18 forgot my password and that's what made me create the
19 new one back in 2011, 2012, I think.
20 Q.     And you don't use the Beyshaud El account --
21 Facebook account anymore?
22 A.     No, sir.  I don't know the password.
23 Q.     If there's any posts on that account, would
24 those have been by you?
25 A.     Nothing recent.

1  Q.       Was your brother at them?
2  A.       I honestly don't even remember them myself.
3  Q.       Okay.
4  A.       So --
5  Q.       Alright.  One final question.  In Exhibit A from
6  earlier today -- take a look at that -- which is the
7  same -- this was used as an exhibit in your brother's
8  deposition, Exhibit A, which is a list of plaintiffs'
9  responses to certain questions the defendants asked, and
10 could you please turn to question nine?  It's
11 actually -- no number.  I think it should be like page
12 number eight but it actually does not have a page number
13 at the bottom, but it's question nine.  It's the
14 question that says in paragraphs forty-eight to -- this
15 has to do with your claim against the City of
16 Pittsburgh.
17 A.       Alright.
18 Q.       Question nine says, you were asked in paragraphs
19 forty-eight to fifty-eight of your complaint, you allege
20 the City of Pittsburgh, quote, had in effect policies
21 and practices and customs that condoned and fostered
22 unconstitutional conduct of the individual defendants
23 and were a direct and proximate cause of the damages and
24 injuries complained of herein, unquote.  It is further
25 alleged that such alleged wrongful policies, practices,

53

1  customs and/or usages demonstrated an indifference on
2  the part of policy makers of the City of Pittsburgh to
3  the constitutional rights of persons within the city and
4  was a direct and proximate cause of the violation of the
5  plaintiffs' rights alleged herein, end quote, and then
6  it asks you to identify and describe any and all
7  evidence in your possession that supports the
8  allegation, and the answer to that was see police
9  report.
10 A.      Uh-huh.
11 Q.      Does this question and answer look familiar to
12 you?
13 A.      Yes.
14 Q.      Okay.  And can you tell me what the answer see
15 police report means?  What's that referring to?
16 A.      It was everything that's in the police report.
17 Q.      And you were talking about the police report
18 from of the July 2, 2013 arrest?
19 A.      Yes.
20 Q.      Do you have any other evidence that -- either in
21 your possession or that you're aware of that supports
22 your claim against the city?
23         MR. HOLLIS:  I'm going to object because I
24 believe your question was identify and describe evidence
25 that was in his possession at the time that you gave him