**In The Matter Of:**

*WILL EL, ET AL. v.*
*CITY OF PITTSBURGH, ET AL.*

*WILL EL*
*November 6, 2017*

*AA COURT REPORTERS*
*412.288.5370*

Original File ELWILL-110617.txt
**Min-U-Script® with Word Index**

13

1  Q.      Okay.  And when you say police truck, are you
2  referring to like an SUV?
3  A.      Yes.  Marked car.  Squad car with the police
4  lights and everything.
5  Q.      So, it was a marked car?
6  A.      Yes, ma'am.
7  Q.      And, now, you told your brother to empty his
8  pockets; is that correct?
9  A.      Yes.
10 Q.      Why did you think it was important for you to
11 empty your pockets?
12 A.      Because I didn't know why we were being stopped
13 and I just wanted to show the officer that we didn't
14 have anything on us and that we weren't doing anything.
15 Q.      What did you have in your pockets?
16 A.      Just the various items we had purchased from the
17 store, my ID, a couple dollars, probably like forty,
18 fifty dollars between the both of us.
19 Q.      So, did you have the cigarettes and the
20 cigarillo on your person?
21 A.      I had the cigarette in my hand.  I was smoking
22 it.
23 Q.      What about the cigarettes and the cigarillo that
24 you had purchased at the store?  Who had those items on
25 them?

1  A.      My brother had the cigarillo.  He was smoking a
2  cigarette, as well.
3  Q.      So, when you removed the items from your pocket,
4  you had the cigarettes and the candy?
5  A.      Everything was on the ground.  When we removed
6  our items from our pockets, everything was spread out on
7  the ground.
8  Q.      But you had the cigarettes and the candy in your
9  pockets?
10 A.      We both had a cigarette and we both had candy.
11 Yes, ma'am.  But at this moment, everything is spread
12 out on the ground.
13 Q.      How old were you on the date of this incident?
14 A.      I'm twenty-six now.  I believe I was about
15 twenty-two at the time.
16 Q.      Now, did you live in that area?
17 A.      Yes, ma'am.
18 Q.      Approximately how far away from One Stop did you
19 live?
20 A.      Two turns and about three blocks, street blocks.
21 Let's say if it was the 7000 block, you go to the
22 seventy-two.  That's about three, three blocks and two
23 turns.
24 Q.      Okay.
25 A.      It's a very short distance.

1  A.      Yes, ma'am.
2  Q.      How do you know she called for backup?
3  A.      Because a lot of police arrived.
4  Q.      Okay.  How many police arrived?
5  A.      It had to be more than two or three cars.  I'm
6  not sure how many police officers were there.
7  Q.      Okay.  But you believe you saw two to three
8  cars?
9  A.      Two to three cars.  There was an undercover car.
10 It kept coming around the corner when we were sitting on
11 the ground.
12 Q.      And when you say undercover car, I think
13 undercover cars -- we all know what they look like, but
14 it's a car that you can tell has police lighting but
15 it's not marked on the outside with City of
16 Pittsburgh Police?
17 A.      Yes.  I guess you could say that.  It was an
18 Impala.
19 Q.      An Impala?
20 A.      Yes.
21 Q.      Okay.  And you recognized it to be an undercover
22 car; correct?
23 A.      Yes, ma'am.
24 Q.      Okay.  Now, was this the first time that you had
25 ever been stopped by a police officer?

17

1  A.      Ever in my life?
2  Q.      Yes.
3  A.      No.  I have been pulled over before.
4  Q.      Okay.  So, prior to this incident, you had been
5  pulled over while driving a vehicle?
6  A.      Yes.  Years ago.
7  Q.      Okay.  About when did that occur?
8  A.      Probably two to three years ago.  I was told I
9  had rolled a stop sign.
10 Q.      And was that your only other interaction with
11 police up until July 2, 2013?
12 A.      Yes.  I believe so.
13 Q.      Okay.  And did you receive a traffic citation
14 for that incident two to three years ago?
15 A.      Yes.  Yes.  I paid it in Wilkinsburg magistrate.
16 Q.      Okay.  So, it was a summary traffic offense?
17 A.      Yes.  Paid in full.
18 Q.      Now, you had also said that there was some sort
19 of an altercation on this date; is that correct?
20 A.      Yes, ma'am.
21 Q.      What happened?
22 A.      While we were being ordered to sit on the
23 ground, I still had no understanding of why we were
24 sitting there.  So, I was trying to tell the lieutenant
25 that I felt like that we were being harassed.  As I was

1   saying this, Officer Welling had approaching me and he
2   had asked me if I wanted to know what it felt like to be
3   harassed.  In this incident, I turned and looked at the
4   lieutenant to see if she had heard what he had said to
5   me.  When I turned to look at the lieutenant, Officer
6   Welling grabbed my wrist, grabbed me by my neck, pushed
7   me up against the wall and pulled me to the ground.
8   Q.      Did he say anything else to you other than the
9   comment you just related?
10  A.      No, ma'am.
11  Q.      Do you recall what specifically you were saying
12  to the lieutenant, what your exact words were?
13  A.      My exact words?  No.  I really don't recall.  I
14  just remember saying that I felt like we were being
15  harassed.
16  Q.      Do you recall if you used any swear words?
17  A.      No.
18  Q.      And you were saying this to the lieutenant?
19  A.      I was saying this to all the police officers
20  that were on the scene.
21  Q.      Okay.  And describe Officer Welling to me.
22  A.      Officer Welling?
23  Q.      Yes, please.
24  A.      I'm taller than him.  Kind of heavy.  Dark hair.
25  Q.      How tall are you?

19

1  A.     I'm about six-one, six and a half.
2  Q.     So, he's shorter than six feet one inch tall,
3  shorter than you?
4  A.     Yes, ma'am.
5  Q.     You said he was --
6  A.     Dark hair.
7  Q.     Dark hair.  And you said he was a bigger man?
8  A.     Yeah.  He's bigger than me.
9  Q.     Okay.  And you said he made a comment to you
10 about do you want to know what it feels like to be
11 harassed?
12 A.     Yes, ma'am.
13 Q.     And where was he when he said this to you?
14 A.     He was standing to my right side.
15 Q.     About how far away from you was he when he said
16 this?
17 A.     A step away.  Two steps away.
18 Q.     So, he said this to you and then what happened?
19 A.     He said this to me.  I looked over at the
20 lieutenant to see if she had heard what he said.  As I
21 was looking in the lieutenant's direction, Officer
22 Welling choked me by my neck, grabbed my arm, pushed me
23 up against the wall and pulled me to the ground.
24 Q.     And he didn't say anything while he was doing
25 that part?

24

1  A.      Yes.
2  Q.      And when did you attend those?
3  A.      I don't have the dates written down or anything
4  like that.
5  Q.      Okay.  Do you recall what building you went to
6  court hearings at?
7  A.      At the courthouse down the street.
8  Q.      So, the one that's on Grant Street?
9  A.      Yes.
10 Q.      And what about -- do you know the City Court
11 building which is down on First Avenue?  Do you know
12 where that building is?
13 A.      Yes.
14         MR. HOLLIS:  Municipal Courts building.
15 A.      Down by the PNC Bank?
16 BY MS. CRESSLER:
17 Q.      Yes.
18 A.      Yes, ma'am.
19 Q.      Did you ever have to attend any hearing at that
20 building?
21 A.      I remember going there.  I don't think I did a
22 hearing there.
23 Q.      Do you recall what happened at the hearing at
24 the criminal court on Grant Street?
25 A.      No, ma'am.

1  Q.     Do you recall if you attended a hearing there on
2  more than one occasion, on one occasion?
3  A.     No, ma'am.
4  Q.     Do you know if you ever had to pay any fines or
5  do any community service with relation to what happened
6  on July 2nd?
7  A.     No, ma'am.  I believe I might owe some fines
8  still, but I don't remember paying any fines.
9  Q.     And you said that after you were released from
10 Allegheny County Jail, you went to the hospital; is that
11 correct?
12 A.     Yes, ma'am.
13 Q.     Did you go with your brother?
14 A.     No.  I went with my mom.
15 Q.     And what hospital did you go to, if you
16 remember?
17 A.     Shadyside.
18 Q.     And you went to the emergency department?
19 A.     Emergency room.  Yes, ma'am.
20 Q.     Okay.  And what did you go there for?  What were
21 your complaints?
22 A.     I had lower back pain when I got there.  The
23 lady in the emergency room told me that I had a hip
24 contusion.
25 Q.     And what did you understand a hip confusion to

1  be?
2  A.      A bruise, a deep bruise on, I guess, the bone.
3  Q.      Now, after this incident on July 2nd, while you
4  were lying on the ground, did you notice if you were
5  bleeding from any area of your body?
6  A.      No.
7  Q.      Did you have any head deformities?  And when I
8  say head deformities, did you have any lumps, any
9  swelling on your face?
10 A.      No.  No, ma'am.
11 Q.      Do you have any scars from this incident?
12 A.      No, ma'am.
13 Q.      Are you currently receiving treatment from your
14 injuries sustained during the July 2nd incident?
15 A.      No, ma'am.
16 Q.      Now, after you saw the doctor at the emergency
17 department, what did they tell you to do for followup?
18 Did they give you any medications?
19 A.      They gave me some ibuprofen, some ibuprofen.
20 They told me if I was still having a problem, to come
21 back.
22 Q.      And did you go back?
23 A.      No, ma'am.
24 Q.      Did you go see doctor --
25 A.      By that time, I was already done with that

41

1  A.      I believe so.  I believe so.  I mean, in looking
2  at it from -- it tells me that the case -- that I
3  answered this question with this case.  So --
4  Q.      And what --
5  A.      Plaintiff has been pleaded guilty or convicted
6  of a crime, describe the offenses, where committed and
7  under what names you were convicted.  So, I believe I
8  was talking about this case here.
9  Q.      And can you tell me what you mean by present
10 case?
11 A.      I'm not sure.  This case.  Present.  Present
12 case as far as the case that we're dealing with now, I
13 guess.
14 Q.      Okay.  And you're saying that it's your
15 understanding that your involvement in the case led to a
16 criminal conviction or guilty plea of some kind?
17 A.      Or aggravating a riot.
18 Q.      And can you tell me what is the basis of that
19 claim that you have some kind of conviction for
20 aggravating a riot?  Did somebody tell you that?  Have
21 you seen papers saying that or what?
22 A.      Yeah.  I believe there was some papers saying
23 that.  I don't have them with me, but that's what I was
24 charged with.  Whatever my charges were dismissed from,
25 that's where they were dismissed to, exciting a riot,

1  aggravating a riot.  That was my charge.
2  Q.      Can you tell me everything you did to prepare
3  for this deposition, if anything?
4  A.      Just made sure that I came here and told the
5  truth.
6  Q.      Did you meet with anyone?
7  A.      My brother, my lawyer, just so we can be
8  prepared.
9  Q.      And how many times did you meet to prepare?
10 A.      Once.
11 Q.      Was anyone else present at that meeting --
12 A.      No.  No, sir.
13 Q.      -- besides you, your brother and your attorney?
14 A.      No, sir.
15 Q.      Okay.  Did you review any documents to prepare
16 for the deposition?
17 A.      No, sir.
18 Q.      Just going back to that Exhibit A, and, now, can
19 you turn to page -- it's question number nine.  It was
20 on page eight.
21 A.      Six.  Seven.  Eight.
22 Q.      Okay.  And question nine asked in paragraphs
23 forty-eight to fifty-eight of your complaint, you allege
24 the City of Pittsburgh, quote, had in effect policies,
25 practices and customs that condoned and fostered the

1   unconstitutional conduct of the individual defendants
2   and were a direct and proximate cause of the damages and
3   injuries complained of herein, end quote, and you
4   further allege that such alleged, quote, wrongful
5   policies, practices, customs and/or usages, ellipses,
6   demonstrated a deliberate indifference on the part of
7   policy makers of the City of Pittsburgh to the
8   constitutional rights of persons within the city and
9   were the direct and proximate cause of the violations of
10  plaintiffs' rights alleged herein, end quote.  Please
11  identify and describe any and all evidence in your
12  possession that supports these allegations.
13          The answer to that question is:  See police
14  report.  Is that your answer under oath to that
15  interrogatory?
16  A.      Yes.
17  Q.      And can you explain what see police report
18  means?
19  A.      Your officer used excessive force under those
20  circumstances without giving me a reason why I was
21  stopped, why I was asked to set on the ground.  Never
22  told me anything.
23  Q.      When you say officer, you're referring to
24  Officer Welling?
25  A.      Yes.

51

```
 1   Q.      You can answer.
 2   A.      Yes.
 3   Q.      Okay.
 4   A.      Me and my mom's very close.  I'm her first
 5   child.
 6   Q.      How many siblings?  Your brother Beyshaud and
 7   how many other siblings do you have?
 8   A.      Two.
 9   Q.      Can you tell me who --
10   A.      My brother Emir El.  My brother Tyrese El.  My
11   mother had all boys.
12   Q.      Made for an active household, I'd say.  Are they
13   still in Pittsburgh, your other two brothers?
14   A.      Yes.
15   Q.      How old are they?
16   A.      Eight and seventeen.  Eighteen.  Excuse me.
17   Q.      Do those two brothers still live with your
18   mother?
19   A.      Yes.
20   Q.      How often do you see her now?
21   A.      All the time.  My granddad has dementia, so she
22   checks on him from time to time.  My granddad kind of
23   stays with me, so I kind of see her all the time.
24   Q.      Like --
25   A.      Every day.
```

1  Q.      Every day?
2  A.      Yes, sir.
3  Q.      Has that sort of frequency of seeing her, I
4  mean, has that been true for the last number of years or
5  has it gone up or down or --
6  A.      Can you ask that again, please?
7  Q.      So, you see her every day now?
8  A.      Yes.
9  Q.      Would you be seeing her every day back in
10 July 2013?
11 A.      Oh, yes.  All the time.  At the time, I was
12 living with her.
13 Q.      Right. Right. Okay.  And you said that she --
14 after you -- after the July 2, 2013 arrest, you said she
15 took you to Shadyside Hospital; is that right?
16 A.      Yes.
17 Q.      Now, I believe you said that you remember being
18 taken to the hospital right after being released from
19 the jail.  Is that --
20 A.      Yes.  Not right after, but it was the next day.
21 Q.      The next day?
22 A.      Yeah.  It was the next day.
23 Q.      Are you -- if I told you that the medical
24 records reflect you visiting on July 7, 2013 --
25 A.      That was a couple days after.

                                                                55

1         MR. MCHALE:  She may be testifying as a
2   character witness.  She may be testifying as --
3         MR. HOLLIS:  She's not testifying as a character
4   witness.
5         MR. MCHALE:  Is she going to be testifying at
6   all at the trial?
7         MR. HOLLIS:  Potentially, as a fact witness,
8   because she was there.  You can certainly depose her.
9         MR. MCHALE:  Well, her credibility may be an
10  issue, so I'm allowed to ask the question.
11        MR. HOLLIS:  If you know, answer the question.
12  BY MR. MCHALE:
13  Q.    Do you know if your mother's ever been arrested
14  by the police?
15  A.    Yes.  I seen it on the news, but that was it.
16  Q.    And what was that arrest for?
17  A.    I don't know.
18  Q.    Do you know whether she has any criminal
19  convictions?
20  A.    I don't believe so.  She works for CYS, so I
21  don't believe she would have any criminal convictions if
22  she works for CYS.
23  Q.    Okay.  So, she works for CYS and she also runs
24  the cleaning business?
25  A.    Yes.

56

1   Q.      Do you know if she runs any other businesses or
2   does any other kind of work?
3   A.      Cleaning.  She -- that's it.
4   Q.      Do you remember -- you said you saw some kind of
5   arrest on the news?
6   A.      I saw her name on the news.  I didn't want to
7   watch it.
8   Q.      And do you know anything more about what that
9   was about?
10  A.      No, sir.
11  Q.      You testified earlier that the police had
12  ordered you to sit on the ground after you got stopped?
13          MR. HOLLIS:  Objection as to the
14  characterization.
15  BY MR. MCHALE:
16  Q.      You testified earlier it was Lieutenant Kacsuta?
17  A.      She asked to sit down.  Yes.
18  Q.      When Officer Welling put his hands on you, what
19  was your body position at that time?
20  A.      I was trying to get the lieutenant's attention.
21  Q.      Is it fair to say that you were standing at that
22  time?
23  A.      Yes.  I was standing turned towards the
24  lieutenant.
25  Q.      And what was it that caused you to stand?