| PBP FORM 290 | PITTSBURGH BUREAU OF POLICE "...accountability, integrity and respect." | SUBJECT: "GENERAL PROVISIONS: MANUAL OF PROCEDURAL ORDERS" | ORDER NUMBER: 12-2 |
|---|---|---|---|
| | | PLEAC STANDARD: 1.4.3, 1.4.4 | PAGE 1 OF 3 |
| ISSUE DATE: 5/24/2010 | EFFECTIVE DATE: 5/24/2010 | ANNUAL REVIEW DATE: FEBRUARY | RESCINDS: ALL PREVIOUS | AMENDS: ALL PREVIOUS |

### 1.0 POLICY/PURPOSE:

1.1 To provide for the adoption of General/Procedural Orders as governing directives for the administration and governing of the Bureau of Police.

### 2.0 ADOPTION AND RECISION

2.1 These General/Procedural Orders are hereby adopted and strict compliance with them, within their context is required.

2.2 All existing instructions, which are in conflict with these General/Procedural Orders, are hereby rescinded.

### 3.0 AMENDMENTS

3.1 The Chief of Police has the authority to approve and issue additional General/Procedural Orders, make amendments to existing ones, or may rescind any existing one as he/she deems necessary.

### 4.0 MAINTENANCE AND INSPECTION OF MANUAL

4.1 The Manual of Procedural Orders is the property of the Pittsburgh Bureau of Police. The officer to whom it has been issued is responsible for:
 4.1.1 Keeping the manual in good condition.
 4.1.2 Inserting such supplements and corrections as may be added to keep it current.
 4.1.3 Completing the PBP Form #400, "Procedural Order Distribution Index" when issued a new or revised order.

4.2 The Manual of Procedural Orders will be subject to periodic supervisory review and inspection, and failure to ensure the upkeep of same may result in disciplinary action against the bearer.

4.3 The Manual of Procedural Orders must be returned to the Pittsburgh Bureau of Police upon the termination, resignation or retirement of the bearer, or any other separation from service from the Bureau of Police.

### 5.0 EFFECTIVE DATE

5.1 These General/Procedural Orders as well as any amendments, additions or revisions, shall become effective on a date to be specified by the Chief of Police or; if no date is specified by the Chief of Police, the effective date is understood to be the date of issue.

### 6.0 REVISIONS

6.1 All General/Procedural Orders shall be reviewed regularly, as determined by the Chief, to decide if they should be revised, rescinded or shall remain in effect.

6.2 There shall be a section designated under the Administration Branch to review and revise the general/procedural orders, research best practices, research legal issues, etc., prior to the order's issuance. (This same unit will be responsible for conducting regular reviews and updates in order to keep the policy manual current.)

 6.2.1 After making initial revisions to the existing order, the draft is sent to applicable personnel (subject matter experts) for their review, comment and approval.

| SUBJECT: | ORDER NUMBER: | PAGE 2 OF 3 |
|---|---|---|
| "GENERAL PROVISIONS: MANUAL OF PROCEDURAL ORDERS" | 12-2 | |

- 6.2.2 Once applicable personnel have approved, the draft is forwarded to the Command Group for review and comment.
- 6.2.3 Once the Command Group has approved, the order is forwarded to Fraternal Order of Police (FOP) for review and comment.
- 6.2.4 Once the FOP has had an opportunity to comment (15 days, Refer to the *Working Agreement Between the City of Pittsburgh and the Fraternal Order of Police Fort Pitt Lodge No. 1*), the order is forwarded to the Chief for final review and approval.
- 6.2.5 The approved order is forwarded to the City of Pittsburgh Print Shop where a copy is made for each PBP officer.

## 7.0 DISSEMINATION TO PERSONNEL

7.1 New and revised General/Procedural Orders are distributed to each duty location for dissemination to all PBP officers.

7.2 The Commanding Officer at each duty location shall ensure the following is completed:

- 7.2.1 The General/Procedural Order Number is entered in the appropriate block on each officer's PBP Form #400, "Procedural Order Distribution Index."
- 7.2.2 Each officer acknowledges receipt of his/her copy of this order by initialing and entering the date received in the corresponding blocks on the PBP Form #400, "Procedural Order Distribution Index."
- 7.2.3 Each officer places their copy of the orders in the proper chapter of the Manual of Procedural Orders.
    - 7.2.3.1 If there is a previous version of the order, the previous version shall be purged.

7.3 Upon approval by the Chief, any new or revised General/Procedural order will be placed in the "Manual of Procedural Orders" folder on the I: drive. If there is a previous electronic version of the order, the previous electronic version shall be purged.

## 8.0 NON RETROACTIVE

8.1 These General/Procedural Orders shall not pertain to any incident or act occurring prior to the effective date of the order, but will be governed by the applicable policies and procedures in effect at the time the incident or act occurred.

## 9.0 CONTINUITY

9.1 These General/Procedural Orders shall continue in full force upon change of command of the Bureau of Police unless otherwise ordered, directed or instructed.

## 10.0 RELATED DIRECTIVES

10.1 These General/Procedural Orders or any other written directives or instructions on the same subject matter will be construed to be in a positive, consistent relationship, and not in contradiction to each other.

## 11.0 UNFORESEEN OCCURRENCES

11.1 When confronted with a matter not covered by these General/Procedural Orders, a member or employee will conduct themselves in a manner consistent with the Law Enforcement Code of Ethics and his/her official obligation.

## 12.0 CIVIL RIGHTS NOT AFFECTED

12.1 These General/Procedural Orders shall not be construed as to restrict the civil and/or Constitutional rights of members or employees.

### 13.0 CONSTRUING OF WORDS AND PHRASES

13.1 The words and phrases as used in these General/Procedural Orders will be read in their context and construed according to their popular meaning, except, that those words and phrases specifically defined in the Glossary of Terms herein shall be so interpreted.

### 14.0 APPLICABILITY

14.1 These General/Procedural Orders will apply with equal force to members and employees alike insofar as they are applicable.

Approved By:

_[signature]_ Date 5-18-10
Paul Donaldson
Acting Chief of Police

| PBP FORM 290 | **PITTSBURGH BUREAU OF POLICE** "...accountability, integrity and respect." | SUBJECT: "USE OF FORCE" | ORDER NUMBER: 12-6 |
|---|---|---|---|
| | | PLEAC STANDARD: 1.3.2 and 1.3.10 a – d & f | PAGE 1 OF 5 |
| RE-ISSUE DATE: 3/1/12 | EFFECTIVE DATE: 3/1/12 | ANNUAL REVIEW DATE: JANUARY | RESCINDS: ALL PREVIOUS | AMENDS: NONE |

## 1.0 POLICY OR PURPOSE

1.1 The purpose of this General Order is to provide police officers with guidelines regarding the utilization and reporting of both deadly and non-deadly force.

1.2 The City of Pittsburgh Bureau of Police recognizes and respects the inherently special value of each human life. The law recognizes, however, that police officers, in the performance of their duties, will encounter situations where it is necessary to use force in order to effect an arrest or otherwise protect the public welfare; or as a means of protecting themselves or others.

1.3 It is the policy of the Bureau of Police that use of force, as designated herein, shall be reported in a timely, complete, and accurate manner by involved officers as prescribed by this policy.

## 2.0 DEFINITIONS

2.1 <u>Use of Force</u> – The amount of effort required by police to compel compliance from a person.

2.2 <u>Deadly Force</u> – Force which, under the circumstances in which it is used, is readily capable of causing death or serious bodily injury.

2.3 <u>Non-deadly Force</u> – Any use of force other than that which is considered deadly force.

2.4 <u>Impact Weapon</u> – Use of any hard object as a less-lethal weapon to compel compliance. Such term shall include, but is not limited to: any blackjack, police baton, or ASP.

2.5 <u>Chemical Force</u> – Any use of OC spray or other chemical suppressant.

2.6 <u>Physical Force</u> – The use of any part of an officer's body, the use of a vehicle, or the use of police canines to compel compliance.

2.7 <u>Less Lethal Force</u> – The use of kinetic energy projectiles deployed to areas of the subject's body that are considered less likely to cause death or serious bodily injury. Such term shall include, but is not limited to: any discharge of a TASER either through use of a cartridge or in the drive stun mode, sock round, K01 baton round, or similar object authorized for use by the PBP.

2.8 <u>Weapons of Last Resort</u> - The Bureau recognizes that in some extreme circumstances, where the safety or survival of the officer is in jeopardy, the situation may dictate utilizing other implements (brick, hammer, car) as weapons. Use of such weapons should be viewed as weapons of last resort.

2.9 <u>Reasonable belief</u> – the facts or circumstances the officer knows, or should know, that are such as to cause an ordinary and prudent person to act or think in a similar way under similar circumstances.

2.10 <u>Serious bodily injury</u> – bodily injury which creates a substantial risk of death or which causes permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

2.11 <u>Forcible Felony</u> – the crimes of murder, voluntary manslaughter, rape, robbery, kidnapping, involuntary deviate sexual intercourse, arson endangering persons, and aggravated assault causing serious bodily injury.

| SUBJECT: "USE OF FORCE" | ORDER NUMBER: 12-6 | PAGE 2 OF 5 |
|---|---|---|

### 3.0 USE OF FORCE

3.1  The City of Pittsburgh expressly forbids any use of force that is excessive. Excessive force is the use of force which exceeds the level that a reasonable officer might reasonably believe, at the time of the incident, is necessary under the circumstances of a particular incident.

3.2  Officers shall only use that level of force which the officer might reasonably believe is necessary to affect an arrest, gain compliance, or to protect the officer or others from physical harm. To gain control in a physical confrontation, an officer may be required to use a force option which exceeds the level of force employed by the subject, and an officer may do so, so long as the force option utilized is reasonable under the circumstances.

3.3  The provisions of this policy shall apply to any use of force occurring while an officer is acting in an official law enforcement capacity.

3.4  Any use of force as described herein shall be employed in accordance with the training that has been received by the involved member and in accordance with all written directives pertaining to the use of force.

3.5  Any use of force as defined in Section 2.0 of this order by a member of the Bureau of Police shall be reported on the Subject Resistance Report (SRR), PBP Form 10.10.

    3.5.1  For the purpose of this order, the following shall **NOT** be considered as uses of force, and a SRR PBP Form 10.10 will **NOT** be completed unless otherwise noted:

- The mere presence of police officers or police canines
- The police issuance of verbal commands
- *Handcuffing with no or minimal resistance when used as a restraint in arrest and transport activities
- *Come-along holds
- *The physical removal of peacefully resisting demonstrators
- The unholstering or display of a firearm or TASER

*(\*An SRR PBP Form 10.10 must be completed where the use of such force results in injury to the subject requiring medical treatment before acceptance into a detention facility.)*

3.6  PBP personnel are not authorized to use neck restraints or similar control techniques which have the potential for serious injury unless involved in a deadly force encounter.

### 4.0 DISCHARGE OF FIREARMS

4.1  Pittsburgh Bureau of Police personnel will refer to General Order 12-7, "Discharge of Firearms", as the Bureau policy regarding the handling of firearms, unintentional discharge of firearms, or the discharge of a firearm to destroy an animal.

### 5.0 USE OF DEADLY FORCE

5.1  A "peace officer" (law enforcement officer) as defined in Chapter 5 of the Pennsylvania Crimes Code, Title 18 C.S.A. Section 501, shall only use deadly force when necessary and justified to affect lawful objectives in conformance to the Pennsylvania Crimes Code, other Pennsylvania statutory provisions, and Pennsylvania and Federal Court decisions. Title 18, Chapter 5, Section 508, Subsection (a.), relating to "The Use of Force in Law Enforcement", provides for the lawful and justified use of deadly force by a police officer only when they believe that:

    5.1.1  The action is in defense of human life, including the officer's own life, or in defense of any person in imminent danger of serious physical injury, or when they reasonably believe both that:

        5.1.1.1  Such force is necessary to prevent the arrest from being defeated by resistance or escape; and

| SUBJECT: "USE OF FORCE" | ORDER NUMBER: 12-6 | PAGE 3 OF 5 |
|---|---|---|

    5.1.1.2  The person to be arrested has committed, or attempted, a forcible felony or is attempting to escape and possesses a deadly weapon, or otherwise indicates that the person to be arrested will endanger human life or inflict serious bodily injury unless arrested without delay.

5.2  According to the United States Supreme Court in *Tennessee vs. Garner* (1985) a verbal warning, IF FEASIBLE, must be given prior to the use of deadly force by an officer.

5.3  When an officer intentionally employs deadly force against another person, and death or injury results, the following procedures will apply:

- The officer shall determine the physical condition of the injured party, and render first aid when appropriate. Medical assistance shall be immediately requested.
- The officer shall immediately notify Communications of the incident and location so that proper notifications may be made.
- Other than a brief overview to the supervisor, the involved officer(s) shall not discuss the incident with anyone except Homicide personnel and the FOP Attorney. When necessary, this overview shall include information that is required for a broadcast to apprehend suspects, vehicles, recover evidence or locate witness.

5.4  The shift supervisor will respond immediately and secure the scene. The shift supervisor will:

- Notify the appropriate Commander via the chain of command of the incident,
- Notify the Homicide Squad, which will be responsible for conducting the investigation (See section #12-10, "Critical Incident Procedures Involving Police"),
- Ensure that all Bureau policies and procedures are followed, and
- Ensure that the SRR PBP Form 10.10, the Weapon Discharge Report and any other required or necessary documents are prepared and submitted.

5.5  All agency personnel that are authorized to carry firearms shall receive in-service training, at least annually, on the agency's use-of-force and deadly force policies.

**6.0  USE OF NON-DEADLY FORCE**

6.1  Following the use of any non-deadly force employed under the color of law by an officer, the officer will determine the physical condition of the party, and render first aid when appropriate. Medical assistance shall be immediately requested.

6.2  Officers shall then make an immediate verbal report to their supervisor following the use of any use of non-deadly force except those identified in Section 3.5.1.

6.3  The supervisor shall:

    6.3.1  Ensure that any/ all officers who use non-deadly force in an incident submit written SRRs PBP Form 10.10, as required under this policy, and any other required or necessary documents are prepared and submitted and,

    6.3.2  Ensure that all Bureau policies and procedures are followed.

6.4  **Training** - all recertification training will be done on a yearly or biennial basis as described below.

    6.4.1  The following shall be recertified on a yearly basis;

        6.4.1.1  TASER

    6.4.2  The following shall be recertified on a biennial (every other year) basis;

        6.4.2.1  OC spray
        6.4.2.2  ASP, baton, or other impact weapon
        6.4.2.3  Specialty Impact Weapons such as bean bag rounds

    6.4.3 All training shall be evaluated by a certified instructor.

        6.4.3.1 The PBP training academy shall verify all instructor certifications and maintain a record of each instructor's certifications.

    6.4.4 All training and qualifications shall be documented with a copy of all records kept at the PBP training academy.

## 7.0 REFERRAL/TRANSPORT FOR MEDICAL ATTENTION

7.1 If the use of force against a subject results in injury of which an officer has actual knowledge or an immediate complaint of injury where an officer has actual knowledge of such complaint, the subject shall be examined by an appropriate health care provider prior to interrogation or processing.

7.2 Refusal of treatment by the subject shall be documented and verified by the officer and attending physician or health care provider.

## 8.0 REPORTING USE OF FORCE

8.1 Each officer who uses force in an incident shall submit a separate written SRR PBP Form 10.10.

8.2 The SRR shall be completed in its entirety as soon as time and circumstances permit, but in no event later than the end of his or her current tour of duty. If a member is incapacitated, the officer's immediate supervisor will submit the SRR for the officer and will note in the "Shift Supervisor Remarks" section that this was done.

    8.2.1 For officers working secondary employment details, they have the option of remaining in a paid status to complete any non-arrest related SRR reports that may have arisen while working the secondary employment detail or they may wait until their next regularly scheduled shift to complete the SRR report. All SRR reports related to an arrest MUST be complete prior to the detail officer ending their tour.

8.3 The actions of the subject that necessitated the use of force and the reasons why the officer used force will be fully described in the narrative section of the Investigative Report.

8.4 It is acceptable for officers to document the narrative only once on the Investigative Report, and make reference to the narrative on any related reports by entering the statement "See Related Investigative Report for Narrative." Supervisors may require officers to provide more detailed information about the actor's resistance in the SRR narrative section.

8.5 The narrative section of the Investigative Report will list all officers involved in assisting with a use of force incident.

8.6 All involved officers will complete the SRR and return it to their own duty location. The immediate supervisors assigned to their duty location will review the report. This applies whether the officer was on or off duty.

    8.6.1 If the officer is off-duty or working secondary employment and he or she is anticipating an extended absence from their assigned duties, i. e. vacation, they shall ensure that the SRR is submitted to their immediate duty location supervisor prior to commencing the absence.

    8.6.2 If the officer is a SWAT operator who is not assigned to SWAT on a full-time basis, they shall submit the SRR through the chain-of-command of the zone/unit where they are assigned. It will then be the responsibility of shift supervisor to forward the SRR to the zone in which the incident occurred.

8.7 The SRR will be forwarded through the chain of command to the duty location Commander.

## 9.0 REVIEW POLICY

9.1 The shift supervisor will review the SRR PBP Form 10.10 to determine whether Bureau policies and procedures were appropriately followed.

| SUBJECT: "USE OF FORCE" | ORDER NUMBER: 12-6 | PAGE 5 OF 5 |
|---|---|---|

    9.1.1 Concerns or issues relating to a particular SRR will be communicated by the shift supervisor on a Form 54 (Special Report) through the chain-of-command to the Duty Location Commander.

9.2 The Duty Location Commander will review the SRR to determine whether Bureau policies and procedures were appropriately followed.

    9.2.1 When a Duty Location Commander approves a SRR, and determines that no excessive use of force was used, the original report shall be forwarded to the Assistant Chief of the Administration Branch.

    9.2.2 When a Duty Location Commander has reason to believe that excessive force may have been used in an incident, the Commander will check the "OMI Investigation Requested" block located on Page 2 of the SRR, and will attach a Special Report explaining the reason for this request.

    9.2.3 When a Duty Location Commander has checked either the "OMI Investigation Requested" or "Homicide Investigation Requested" block on Page 2 of the SRR, the distribution outlined in section 9.4 will apply, however, copies of the report will also be forwarded through the chain of command to the Office of the Chief of Police.

    9.2.4 The Duty Location Commander will attach any Special Report(s) PBP Form 54 describing any necessary actions initiated during the review process for each SRR as it passes through the chain of command.

9.3 The Assistant Chief of the Administration Branch will send one copy of the completed form to each of the following:

- The Assistant Chief of the appropriate branch.
- The Commander of the Zone in which force was required to overcome the subject's resistance.
- The officer's duty location performance file.
- The Director of the Training Academy.
- The Manager of OMI.

9.4 Assistant Chief of Administration will review all SRRs to determine whether:

- Any violations of Bureau policies and procedures occurred;
- Applicable Bureau policies were clearly understandable and adequate;
- Any deficiencies in training are evident.

9.5 The Assistant Chief of Administration will also:

    9.5.1 Notify the Chief of Police in the event a pattern of the employment of excessive force by a particular officer(s) is detected;

    9.5.2 Make recommendations to the Chief of Police concerning policy changes and additional training requirements; and

    9.5.3 Prepare, at minimum, quarterly reports of use of force incidents for the Chief of Police.

Approved By:

_____     _____
Nathan Harper                                                                    Date
Chief of Police

| PBP FORM 290 | PITTSBURGH BUREAU OF POLICE  *"...accountability, integrity and respect."* | SUBJECT:  "TASER" | ORDER NUMBER:  12-13 |
|---|---|---|---|
| | | PLEAC STANDARD: NONE | PAGE 1 OF 7 |
| RE-ISSUE DATE: 6/17/2016 | EFFECTIVE DATE: 5/1/2012 | ANNUAL REVIEW DATE: JUNE | RESCINDS: ALL PREVIOUS | AMENDS: NONE |

### 1.0 PURPOSE OR POLICY

1.1 The purpose of this policy is to establish guidelines for the use of the TASER by members of the Pittsburgh Bureau of Police whether such was issued or privately purchased.

1.2 The Pittsburgh Bureau of Police has approved the use of the TASER to provide officers with an additional use of force option. This is a less lethal device that falls under Level 3, "Compliance Techniques," as defined in Procedural Order #12-8 "Continuum of Control" and is to be used to control actively resisting subjects, aggressive non-compliant subjects, violent or potentially violent subjects.

1.3 Pittsburgh Bureau of Police personnel will refer to Procedural Order #12-6, "Use of Force" which shall continue in effect as the Bureau policy regarding the utilization and reporting of force.

1.4 The TASER is NOT a replacement for the officer's duty firearm. In those incidents where the officer reasonably believes the actions of another constitute an immediate threat of death or serious bodily injury to the officer or a third party, the TASER should not be used without firearm back-up.

*See also General Order 12-6 Use of Force*

### 2.0 DEFINITIONS

2.1 <u>TASER</u> – A less lethal device used to incapacitate subjects by discharging an electronic current into the subject. The TASER is a Conducted Electrical Weapon (CEW) system and uses propelled wires to conduct energy to a remote target, thereby controlling and affecting the central nervous system. The TASER can also be used in touch application without shooting the probes. Upon impact with the body (skin or up to 2 inches of clothing) the electrical pulses of the TASER then override the central nervous system and take direct control of the skeletal muscles.

2.2 <u>Discharge</u> – To fire a TASER cartridge, display the arc, or to touch or to attempt to touch a subject with the TASER while the TASER is in the stun mode.

2.3 <u>Penetrate</u> – To enter or diffuse through or into (the clothing or skin).

2.4 <u>Spark Test</u> – Activation of the TASER with no cartridge inserted for the purpose of verifying the operability of the TASER as well as preserving the life of the TASERs internal electronics. The TASER need only be activated for one or two seconds to complete this test.

2.5 <u>Unintentional Discharge</u> – A TASER discharge that is not caused by the user deliberately pulling the trigger of the TASER.

### 3.0 AUTHORIZATION

3.1 Only officers who have completed the prescribed course of instruction at the Pittsburgh Police Training Academy are authorized to carry the TASER or another make and/or model as approved by the Chief of Police.

   3.1.1 All authorized TASERs, either Bureau issued or privately purchased, shall be registered with the Bureau of Police Training Academy.

| SUBJECT: "TASER" | ORDER NUMBER: 12-13 | PAGE 2 OF 7 |
|---|---|---|

    3.1.2  It will be the responsibility of the Training Academy to maintain a database, which contains information pertaining to the registered TASER such as model and serial number of authorized TASERs.

3.2  TASERs and cartridges approved and authorized by the Chief of Police through written order are the only models that will be carried.

3.3  The TASER will only be carried in holsters approved and authorized by the Chief of Police.

3.4  The Training Academy Director shall ensure that a current list of those officers who have been issued and are qualified to carry/use the TASER is forwarded to each duty location each year. This list will be posted and maintained by the shift supervisors at each duty location.

**4.0 PROCEDURES**

4.1  Officers authorized to carry a TASER are responsible for maintaining the device's operational readiness. As such, officers will:

    4.1.1  Inspect the TASER for any obvious damage before taking it into the field. This inspection will include a check of the light, laser site, frame, trigger housing, and safety switch for functionality. If a TASER is determined to be functioning improperly, it should be taken out of service and sent to the Training Academy for repair along with a Special explaining the repair needed.

        4.1.1.1  All TASERs submitted for Maintenance, Repair, or Data Retrieval (that will require the TASER to remain at the academy) must be accompanied by either a Special or a Lost/Stolen/Damaged Uniform od Equipment Report:

            4.1.1.1.1  A Special Report, PBP Form stating:

- TASER serial number
- Name of the registered owner (for privately owned or Department issued TASERs)
- The reason for repair / maintenance / data retrieval (i.e. malfunction, battery, no spark, etc.)
- Name of the officer reporting the malfunction
- If a TASER holster accompanied the TASER to the Academy
- CCR # (if applicable)
- Shift supervisor responsible for return of the TASER after the repair

            4.1.1.1.2  A Lost/Stolen/ Damaged Uniform or Equipment Claim, PBP Form 81.1 stating:

- TASER serial number
- Name of the registered owner (for privately owned or Department issued TASERs)
- The reason for repair / maintenance (i.e. malfunction, submerged, dropped, etc.)
- If a TASER holster accompanied the TASER to the Academy
- CCR # (if applicable)
- Shift supervisor responsible for return of the TASER after the repair

        4.1.1.2  When submitting TASERs for repair/maintenance, DO NOT REMOVE THE BATTERY. This will disrupt the TASER's programming, possibly causing permanent damage.

        4.1.1.3  If the TASER is stuck in the "on" position, it will automatically power down after 20 minutes. It can then be safely transported to the academy for repair.

    4.1.2  Check the TASER's battery strength to ensure adequate battery charge by performing a spark test.

        4.1.2.1  This will be done daily by the individual officer at each Zone for City issued TASERs and by the individual officers for privately owned and department issued TASERs.

| SUBJECT: "TASER" | ORDER NUMBER: 12-13 | PAGE 3 OF 7 |
|---|---|---|

    4.1.2.2  Privately owned or department issued TASERs at other duty locations will be checked once daily as per the guidance of that duty location's Commanding Officer.

    4.1.2.3  Replacement batteries will be provided by the Academy for both City issued and privately owned TASERs.

4.1.3  When on duty, carry the TASER in the approved holster, loaded with a cartridge with the safety in the 'ON' position and the switch in the 'OFF' position.

4.1.4  Wear the TASER holstered on the opposite side of the officer's handgun.

4.1.5  Officers should carry at least two cartridges with the TASER, when available.

    4.1.5.1  Officers will also check the expiration date and condition of the TASER cartridges. Cartridges should be inspected for damaged or loose doors. Expired and/or damaged cartridges will be turned in to the Quartermaster for replacement.

4.1.6  Store the TASER and any extra cartridges in the issued holster or case when not in use.

4.1.7  Avoid dropping the TASER and exposing it to water.

4.1.8  Avoid direct sunlight exposure and static electricity.

**5.0 TASER USAGE CRITERIA**

5.1  Discharge of the TASER constitutes physical force under the Pennsylvania Crimes Code, Section 508 (Use of Force in Law Enforcement). The discharge of the TASER is authorized when used in accordance with the Rules & Regulations of the Pittsburgh Bureau of Police, in particular, policies on use of force and use of TASER and applicable laws of the Commonwealth of Pennsylvania and the United States of America, in particular the Constitution of the United States.

5.2  Situations in which the use of the TASER may be authorized include, but are not limited, to the following:

- When presented with a mentally ill individual who is exhibiting behavior that would lead an officer to use the TASER as a reasonable force option.
- Warrant service when the individual who is exhibiting behavior that would lead an officer to use the TASER as a reasonable force option.
- Persons under the influence of drugs and/or alcohol who are exhibiting behavior that would lead an officer to use the TASER as a reasonable force option.
- Persons expressing the intent and having the means to commit suicide and who are exhibiting behavior that would lead an officer to use the TASER as a reasonable force option.
- Effecting arrest as per section 508- Title 18

5.3  Under no circumstances shall an officer resort to the use of the TASER where such a use of force is in violation of General Order #12-6, "Use of Force" policy. Nothing in this policy is intended to conflict with or replace the provisions of the "Use of Force" policy.

5.4  It is also the policy of this Bureau that personnel will not necessarily or unreasonably endanger themselves in applying these guidelines. Furthermore, it is policy of this Bureau that the TASER is not intended to be used as a substitute when the officer is justified in the use of deadly force in accordance with the policy outlined in the Pittsburgh Bureau of Police Manual of Procedural Orders, General Order #12-6.

**6.0 INTENTIONAL TASER DISCHARGE**

6.1  Upon encountering an incident in which it is determined that the TASER may be required and no officer at the scene has a TASER, the officer shall broadcast a request for "Code Zebra." This code will represent to the dispatcher/communications the request to have a TASER on scene.

| SUBJECT: "TASER" | ORDER NUMBER: 12-13 | PAGE 4 OF 7 |
|---|---|---|

6.1.1 Shift supervisors will notify communications which officers have TASERS by writing "TASER officer" after the unit number on the rundown that is faxed to communication.

6.2 When reasonable, prior to firing the TASER, the officer discharging the TASER shall loudly announce that the TASER is going to be discharged.

**7.0 RESPONSIBILITIES OF OFFICERS AFTER TASER DISCHARGE**

7.1 Following the discharge of the TASER, the officer shall secure the subject and the scene ensuring officer safety.

7.2 A medical release from a hospital will be obtained for all subjects exposed to the discharge of the TASER, either by contact stun or probes if the subject is to be lodged in the ACJ or other detention facility.

7.3 If the officer observes any objective sign indicating that the subject requires **IMMEDIATE** medical treatment following exposure to the discharge of the TASER, either by contact stun or by probes, an EMS Unit shall be summoned to the scene immediately.

7.4 The following grid shall be consulted to determine the appropriate probe removal procedure to be taken after a TASER probe discharge if the subject is to be lodged in the ACJ or other detention facility:

|   | **TASER Probes Successfully Discharged?** | **Yes** | **No** |
|---|---|---|---|
| 1. | Did the probes penetrate the subject? | Go to Step #2 | No further action. |
| 2. | If the probes penetrated the subject, was a Supervisor called? | Go to Step #3 | Call a Supervisor and Go to Step #3 |
| 3. | Did the probes penetrate the subject's clothing **ONLY**? | An officer trained in probe removal may **immediately** remove the probes and transport the subject to the hospital for a medical release | (Probes penetrated subject's body) Go to Step #4 |
| 4. | Did penetration of the probes:<br>• Render the subject unconscious<br>• Cause him/her to exhibit signs of a serious medical condition<br>• Cause a secondary injury as a result of a fall<br>• Cause penetration in sensitive tissue areas (i.e. face, neck, breast or groin)? | Request EMS Unit. Wait for the EMS unit to arrive for probe removal. Transport the subject to the hospital for treatment and/or release. Go to Step #5 | Although discharge resulted in penetration, an officer trained in probe removal may **immediately** remove the probes if none of these conditions resulted. The subject shall then be transported to the hospital for a medical release. Go to Step #5. |
| 5. | Subject transported to Hospital | Obtain a medical release | Transport to hospital for medical release. |

7.5 Ensure that any discharged cartridges, probes, and a sampling of Anti-Felon Identification (AFID) "microdots" that are discharged with the probes are collected and booked as evidence.

7.6 If a subject has been exposed to the discharge of the TASER and it is determined that the charges against the subject will proceed by summons or citation (i.e. the subject will be released and not taken to the ACJ or another detention facility), the subject will be **offered** medical treatment at a local medical facility.

7.6.1 If the subject agrees to treatment, the subject will be transported to a medical facility by the PBP and dropped off. The transporting officer will ensure that the subject, at a minimum, checks in at the medical facility before leaving. The subject will be responsible to procure transportation from the medical facility to their home, vehicle, etc.

7.6.2 If the subject refuses treatment and **has not** been exposed to a TASER probe in a sensitive tissue area such as the face, neck, breast, or groin, officers shall notify a supervisor and dispatch via the radio so as to leave recorded documentation of the subject's refusal. Officers shall also document the subject's refusal in their reports.

7.6.3 If the subject **has** been exposed to a TASER probe in a sensitive tissue area such as the face, neck, breast, or groin, the officer shall get treatment at a medical facility for the subject. The officer shall call EMS to the scene and EMS shall determine if the subject requires transport to a medical facility by ambulance. If EMS does not transport the subject, the officer shall transport the subject to a medical facility.

    7.6.3.1 At the medical facility, if the subject refuses treatment, that refusal must be made to medical facility personnel and not City EMS. The officer shall document the subject's refusal as well as the attending physician's name for their report. Once the subject has been released from the medical facility, the officer shall explain to the subject that he/she is no longer in police custody.

    7.6.3.2 At the medical facility, if the subject accepts treatment, the officer may leave once the subject has been admitted by the medical facility or they have otherwise accepted the subject into their care.

7.6.4 If the subject is exhibiting symptoms that a reasonable officer would conclude are a sign of medical distress, the officer shall immediately summon medical personnel.

7.6.5 Officers will use the nearest medical facility to the incident unless they have approval from a supervisor to use a different facility.

**8.0 THE HANDLING OF PROBES FROM THE TASER**

8.1 Probes that have penetrated the body should be treated as bio-hazardous "sharps."

8.2 Probes are to be carefully placed sharp tip first into the spent cartridge wire pockets and secured in place with a strip of tape, i.e. evidence tape.

8.3 Probes are to be treated as evidence. Once the probes are secured into the spent cartridge they are to be packaged and sent to the Property Room.

**9.0 REPORTING USAGE OF THE TASER**

9.1 All intentional discharges of the TASER are to be reported by the discharging officer. Any discharge, whether resulting in physical contact with an individual or not, shall be reported on the PBP Form #10.1 "Subject Resistance Report Form" along with any other related reports and submitted to the officer's supervisor for review. Officers will include the serial number of the TASER and cartridge(s) in their report.

9.2 Officers will immediately make a verbal report to their supervisor following the use of the TASER.

9.3 If the actor or officer requires medical treatment a supervisor will respond to the scene.

9.4 All unintentional discharges will be reported through a PBP Form #54 "Special Report" outlining the specific circumstances of the discharge. This Special Report shall then be forwarded through the shift supervisor, along with any other related reports, through the chain of command to the Chief of Police the discharged cartridge shall be forwarded by the officer to the Training Academy.

    9.2.1 The Training Academy's Defensive Tactics Section will conduct a debriefing on all unintentional discharges. This debriefing is to be scheduled by the duty location commander as soon as is practical. The TASER unit will be taken out of service and inspected at the Training Academy and will not be returned to the officer until the debriefing is conducted.

9.5 All required reports will be completed and submitted before the end of the affected officer's tour of duty.

9.6 If the discharging officer is not able to make the necessary reports immediately following the usage incident, the shift supervisor will complete and submit all of the required reports prior to the end of the supervisor's tour of duty.

| SUBJECT: "TASER" | ORDER NUMBER: 12-13 | PAGE 6 OF 7 |
|---|---|---|

**10.0 TACTICAL FORMATIONS**

10.1 Under the direct supervision of a Supervisor, the TASER may be utilized as a means of crowd control through the use of formations and display of the TASER's arc. In these situations, a supervisor shall document the TASER discharges by completing an Investigative Report Form 3.0 listing all officers in the formation and noting the times the discharges occurred.

    10.1.1 Any officer who discharges a TASER and makes contact with a subject during a tactical formation shall complete the appropriate forms as directed by Section 9.0 of this order.

**11.0 PROHIBITED USAGE OF THE TASER**

11.1 The City of Pittsburgh forbids the discharge of the TASER in any way that is deemed "excessive force." All intentional discharges of the TASER must fall within the "reasonable officer standard."

11.2 While the TASER is a less lethal weapon meant to gain compliance from a subject, it is not a deadly force weapon and therefore should not be used as a substitute for deadly force.

11.3 The TASER should not be discharged in the proximity of flammable liquids, gases, or any other highly combustible materials that may be ignited by the device including any individual that may have been exposed to combustible substances or liquids such as gasoline.

11.4 The TASER is not to be discharged if the officer has knowledge that any member of another police department, agency, or a civilian has sprayed the subject with OC Spray or any type of other chemical agent because of the potential for combustion.

11.5 The TASER is not to be discharged if it or the air cartridge is submerged in water, due to the likelihood of the cartridge being damaged or unreliable.

11.6 The TASER is not to be used on individuals who have expressed the intent and have the means to commit suicide and any incapacitation resulting from the discharge of the TASER would present a real threat of danger to public safety or a high risk of serious bodily injury to him or herself or another. (i.e. actor has a gun in his/her hand or the actor is standing on a ledge)

11.7 Officers should avoid using the TASER on obviously pregnant females and those individuals under the age of 7 or over the age of 70, unless the encounter rises to the level of a deadly force situation. This restriction is based on the potential for these individuals to fall when incapacitated by the TASER.

11.8 The TASER is not to be used on passively resistant individuals strictly to gain compliance.

11.9 The TASER is not to be used on the driver of a vehicle where that vehicle is in motion or likely to be put in motion by the incapacitation of the driver by the TASER discharge.

**12.0 RESPONSIBILITIES OF SHIFT SUPERVISORS**

12.1 Shift supervisors are responsible for ensuring that:

    12.1.1 All incidents involving any discharge of the TASER are appropriately documented and proper procedure is followed.

    12.1.2 All reports of incidents involving the use of the TASER are forwarded through the Chain of Command.

**13.0 DOWNLOADING OF TASER DATA CHIPS/DATA RECONCILIATION**

13.1 TASER data shall be downloaded on an annual basis or within 3-5 days of any TASER discharge that results in a PBP Form #10.10, Subject Resistance Report being completed.

    13.1.1 The one year period will begin after each annual download or after a download due to a discharge.

| SUBJECT: "TASER" | ORDER NUMBER: 12-13 | PAGE 7 OF 7 |
|---|---|---|

13.2  Individual owned and department issued TASERs will be downloaded when the officer comes to the Academy for recertification provided that an Academy TASER armorer is present.

13.2.1 When the TASER is brought in to be downloaded an Investigative Report Form 3.0 must accompany at the time of download.

13.3  The Academy shall maintain a log of all City issued and privately owned TASERs along with the date the TASER last had a data download.

13.3.1  The Academy staff will be responsible to notify the appropriate Zone or duty location of any TASER that has gone past this one year deadline.

Approved By:

*Thomas Stringvechi* ACTING CHIEF

Cameron McClay
Chief of Police