# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|                                               |     |                                               |
| --------------------------------------------- | --- | --------------------------------------------- |
| WILL EL AND BEYSHAUD EL,                      | )   |                                               |
|                                               | )   |                                               |
| Plaintiffs,                                   | )   |                                               |
|                                               | )   |                                               |
| vs.                                           | )   | Civil Action No. 15-834                       |
|                                               | )   | Judge Nora Barry Fischer                      |
|                                               | )   |                                               |
| CITY OF PITTSBURGH, REYNE                     | )   |                                               |
| KACSUTA, FRANK WELLING, and                   | )   |                                               |
| RYAN WARNOCK,                                 | )   |                                               |
|                                               | )   |                                               |
| Defendants.                                   | )   |                                               |
|                                               | )   |                                               |

## <u>Memorandum Opinion</u>

This is an excessive force case initiated by a pair of brothers, Plaintiffs Will El and Beyshaud El (collectively the "El Brothers"), against the City of Pittsburgh (the "City") and three of its officers: Reyne Kacsuta ("Lieutenant Kacsuta"), Frank Welling ("Officer Welling"), and Ryan Warnock ("Officer Warnock") (collectively the "individual officer Defendants"). Pending before the Court is the motion for summary judgment filed by the City and the individual officer Defendants with respect to all counts contained in the second amended complaint filed against them by the Plaintiffs. (Docket No. 106). Count I of the second amended complaint alleges a 42 U.S.C. § 1983 ("§ 1983") Fourth Amendment excessive force claim against the individual officer Defendants. Count II of the second amended complaint alleges a *Monell v. Dep't of Soc. Serv. of City of N.Y*, 436 U.S. 658 (1978) § 1983 municipal liability claim against the City. Count III of the second amended complaint alleges a state law assault and battery claim against the individual officer Defendants.

The Defendants filed their motion for summary judgment and supporting documents on January 19, 2018. (Docket Nos. 106-109). The Plaintiffs filed their brief in opposition and related documents on March 12, 2018. (Docket Nos. 116, 118-119). Because the Plaintiffs' filings did not include a responsive concise statement of facts as required by Local Rule 56, the Court ordered them to file same no later than April 2, 2018. (Docket No. 120). The Defendants filed their reply brief on March 23, 2018. (Docket No. 122). On March 28, 2018, the Plaintiffs filed their "counter opposition" to Defendants' concise statement of facts, (Docket No. 123), and the Defendants filed an errata regarding their appendix to include inadvertently omitted deposition testimony of Beyshaud El, Will El, and Lieutenant Kacsuta. (Docket No. 124). The Plaintiffs filed their surreply on March 30, 2018. (Docket No. 125). Oral argument was held on the motion for summary judgment on April 12, 2018. (Docket No. 129). The Defendants filed a supplemental brief on April 20, 2018. (Docket No. 130). The Plaintiffs filed a supplemental brief on April 27, 2018. (Docket No. 132). Defendants filed a supplemental concise statement of material fact in support of their motion for summary judgment on May 4, 2018. (Docket No. 133). Plaintiffs filed a response in opposition to Defendants' supplemental concise statement of material facts on May 13, 2018. (Docket No. 134). The motion for summary judgment, thus, is ripe for adjudication.

I.      **Standard of Review**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). The parties must support their respective position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV.

P. 56(c)(1)(A). In other words, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505 (1986). "When confronted with cross-motions for summary judgment, the 'court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Anderson v. Franklin Institute*, 185 F. Supp. 3d 628, 635 (E.D. Pa. 2016) (quoting *Schlegel v. Life Ins. Co. of N. America*, 269 F. Supp. 2d 612, 615 n. 1 (E.D. Pa. 2003); Charles A. Wright, Arthur R. Miller et al., 10A Fed. Prac. and Proc. § 2720 (3d ed. 1998).

In reviewing the evidence, the court draws all reasonable inferences in favor of the non-moving party. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Huston v. Procter & Gamble Paper Prod. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009) (citations omitted). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. *See Anderson*, 477 U.S. at 255; *Marino v. Indus. Crating Co.,* 358 F.3d 241, 247 (3d Cir. 2004); *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 247-48. An issue is "genuine" if a reasonable jury could possibly hold in the non-movant's favor with regard to that issue. *See id.* "Where the record taken as a whole could not lead a reasonable trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587; *Huston*, 568 F.3d at 104.

## II.        Dash-Cam Video evidence

As explained in greater detail below, much of the events at issue in this action were videotaped by a Dash-Cam attached to a police vehicle that arrived on the scene driven by Officer Siara Lawniczak ("Officer Lawniczak"). The video from Officer Lawniczak's Dash-Cam ('the "Dash-Cam Video") was introduced and entered into evidence at the April 12, 2018 oral argument on the motion for summary judgment, was shown to the Court during oral argument, and has been reviewed repeatedly by the Court in deciding the pending motion for summary judgment.

In *Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1769 (2007), the United States Supreme Court reviewed the lower courts' denial of the defendant police officer's motion for summary judgment with respect to the plaintiff's § 1983 use of excessive force in violation of the Fourth Amendment claim on the basis of qualified immunity. In support of the police officer's motion, the officer had submitted a videotape that captured the events in question. *Scott*, 550 U.S. at 379. In discussing how to review the videotape in the context of deciding the pending motion for summary judgment, the *Scott* Court explained:

> The first step in assessing the constitutionality of [the police officer's] actions is to determine the relevant facts. As this case was decided on summary judgment, there have not yet been factual findings by a judge or jury, and [the plaintiff's] version of events (unsurprisingly) differs substantially from [the police officer's] version. When things are in such a posture, courts are required to view the facts and draw reasonable inferences "in the light most favorable to the party opposing the [summary judgment] motion." In qualified immunity cases, this usually means adopting (as the Court of Appeals did here) the plaintiff's version of the facts.
>
> There is, however, an added wrinkle in this case: existence in the record of a videotape capturing the events in question. There are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened. The videotape quite clearly contradicts the version of the story told by respondent and adopted by the Court of Appeals.
> . . .
>
> At the summary judgment stage, facts must be viewed in the light most favorable

to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. [The plaintiff's] version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

*Id.* at 380-81 (citations and footnote omitted). Consistent with the Supreme Court's mandate in *Scott*, in reviewing the motion for summary judgment, to the extent that they are relevant, the Court will view the events shown in the videotape "in the light depicted by the videotape." *See also Ickes v. Grassmeyer*, Civ. No. 3:13-208, 2016 WL 4272358, at *4 n. 3 (W.D. Pa. Aug. 11, 2016), *aff'd sub nom. Ickes v. Grassmyer*, 704 F. App'x 190 (3d Cir. 2017) (although plaintiff had testified that no one asked him to get out of the car, where this command could be heard clearly on the dash cam video of the incident, court determined, "[b]ecause no reasonable juror could conclude that Plaintiff was never asked to get out of the car, the Court will view this fact in the light depicted in the dash cam video for purposes of deciding the pending motions for summary judgment.") (citing *Scott*, 550 U.S. at 380).

## III.    Relevant Facts

Following is a recitation of the facts relevant to the Defendants' motion for summary judgment. On July 2, 2013, Lieutenant Kacsuta observed the El Brothers leaving the "One Stop" convenient store in the Homewood neighborhood of Pittsburgh. (Docket No. 109-3 at 2). Beyshaud

El, who was 18 years old at the time, was holding "a green foil object" in his hand "in front of his body." (*Id.*). In light of current undercover police reports that the "One Stop" store was illegally selling synthetic marijuana, Lieutenant Kacsuta was suspicious that the object in Beyshaud El's hand was illegally purchased synthetic marijuana. (*Id.* at 3-4).

Lieutenant Kacsuta approached the El Brothers in her cruiser and asked to speak to them; they declined and crossed the street away from her. (Docket No. 109-2 at 6). This apparently increased Lieutenant Kacsuta's suspicion that the El Brothers illegally possessed synthetic marijuana, so she turned her car around to investigate them for same. (Docket No. 109-3 at 28).

Lieutenant Kacsuta got out of her car, stopped the El Brothers, and asked them to sit down on the stoop of a vacant storefront; they complied (Docket No. 109-5 at 17). She asked Will El for identification, Will El gave it to her, emptied his pockets onto the sidewalk, and told Beyshaud El to do the same so that Lieutenant Kacsuta knew they did not have anything on them and they were not doing anything. (Docket Nos. 190-2 at 6, 109-5 at 2). At that point, the El Brothers were not free to leave. (Docket No. 116-2 at 16).

It became clear to Lieutenant Kacsuta that the El Brothers did not have synthetic marijuana in their possession. (Docket 116-2 at 21). Nevertheless, Lieutenant Kacsuta did not release the El Brothers because a tobacco product had come out of the store with the El Brothers. (*Id.* at 21-22). Beyshaud El was 18 years old and Will El was 22 years old, so this would not be illegal. Beyshaud El, however, did not have a form of identification on him. (Docket No. 124-3 at 3). Given his youthful appearance and lack of identification, Lieutenant Kacsuta now suspected that the store illegally sold Beyshaud El a tobacco product or he illegally possessed a tobacco product. (Docket No. 116-2 at 21-22).

Lieutenant Kacsuta had called for back-up prior to getting out of her car. (*Id.* at 22). She knew that Officers Welling and Warnock were in the area. (*Id.*). Officers Welling and Warnock arrived on the scene together in less than two minutes. (*Id.*). Ultimately, five additional officers reported to the scene to support Lieutenant Kacsuta. (Dash Cam Video 13:47:21).

Upon arrival at the scene of the stop of the El Brothers, Officer Welling did not know why the Plaintiffs had been stopped by Lieutenant Kacsuta. (Docket No. 116-4 at 12). He just knew they were under investigation and detained for whatever reason Lieutenant Kacsuta had stopped them. (Docket No. 116-4 at 12). Officer Warnock also did not know why the El Brothers had been stopped by Lieutenant Kacsuta. (Docket No. 116-5 at 2). Lieutenant Kacsuta did not tell Officer Warnock to make sure they remained seated. (*Id.*).

While the El Brothers were seated on the curb, Lieutenant Kacsuta picked up Will El's identification from the ground, looked at it, and dropped it on the ground. (Docket No. 124-1 at 6; Dash Cam Video 13:46:43). When Beyshaud El reached to pick up his brother's license, Lieutenant Kacsuta stepped on it. (Dash Cam Video 13:46:43). Throughout this time period, the El Brothers were complaining that they were being harassed. (Docket Nos. 116-2 at 23, 116-3 at 3).

According to Will El, in response to his complaint of being harassed, Officer Welling stated, "do you want to know what it feels like to be harassed?" (Docket No. 124-3 at 5). Will El then stood up, "to make sure the lieutenant [Kacsuta] heard what [Officer Welling] said to [him]." (*Id.* at 14). Will El took one or two small steps in the direction of Lieutenant Kacsuta and Officer Warnock. (Dash-Cam Video at 13:47:05). In response to Will El's movement, Officer Welling

grabbed Will El by his wrist and neck and slammed him back into the wall of the vacant storefront on which stoop the El Brothers had been seated, and on to the pavement.[1] (*Id.* at 13:47:06-07).

Beyshaud El was seated on the storefront stoop immediately next to where Officer Welling and Will El were located when Officer Welling grabbed Will El by his wrist and neck. (*Id.* at 13:47:06). Upon seeing Officer Welling grab his brother, Beyshaud El immediately stood up, turned towards Officer Welling, and attempted to punch Officer Welling and otherwise defend his brother. (*Id.* at 13:47:07). In response, Officer Warnock deployed his taser into Beyshaud El's side for five seconds, causing Beyshaud El to fall to the ground. (*Id.* at 13:47:08; Docket No. 109-6 at 8).

Both Will and Beyshaud El on the pavement and not resisting, six officers then handcuffed and placed the El Brothers under arrest. (*Id.* at 13:47:19 and 13:47:27). This was the first time Officer Warnock had deployed a taser in the field. (Docket No. 116-5 at 11).

Beyshaud El was taken to the hospital and then to jail. (Docket No. 109-6 at 9). Will El was taken directly to jail. (*Id.*). After his release from jail, on July 7, 2013, Will El went to the emergency room of a local hospital because of lower back pain. (Docket No. 109-5 at 9). He was told at the emergency room that he had a hip contusion, which he understood to be a deep bruise on his bone. (*Id.* at 9-10).

The El Brothers were initially charged with aggravated assault on a police officer, but Allegheny County District Attorney Stephen Zappala later amended these charges to summary charges. (Docket No. 93 at 2). Will El was charged with summary disorderly conduct. *See* 18 Pa.C.S. § 5503(a)(4) ("A person is guilty of disorderly conduct if, with the intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he … creates a hazardous

---

[1] Defendants describe this conduct as using "physical force with hand controls to force [Will El] to comply with verbal commands." (Docket No. 108 at ¶ 17).

or physically offensive condition by any act which serves no legitimate purpose of the actor."). Beyshaud El was charged with summary harassment. *See* 18 Pa.C.S. § 2709(a)(1) (A person is guilty of harassment when, "with intent to harass, annoy, or alarm another," he "strikes, shoves, kicks or otherwise subjects the other person to physical contact, or attempts or threatens to do the same.").

On April 14, 2014, the Honorable Kevin Sasinoski of the Court of Common Pleas of Allegheny County ("Judge Sasinoski") presided over Will El and Beyshaud El's joint bench trial. (Docket No. 109-7). Prior to the trial, by order only and without issuing an opinion, Judge Sasinoski denied the Plaintiffs' "Motion to Suppress and Dismiss Charges." (Docket No. 109-8). At the trial, Judge Sasinoski responded to defense counsel's statement that she did not see a punch in the video, as follows:

> I did. And I'm the factfinder. It is obvious that one of them wound up and took a swing at the officer. That punch is clear. I have seen it time and time again.
>
> ***
> I could watch it over and over and over, unless there is more. I'm sure that if there was another tape, you would have presented it and showed it to me.

(Docket No. 109-7 at 2-3). Then, in response to the other defense counsel's statement that Will only stood up once, Judge Sasinoski responded:

> Three times perhaps collectively, if I misspoke. There was at least three times that I saw someone -- one of the two gentlemen get up as they were seated. They were very animated. It was obvious they were having a very animated discussion, gesturing, reaching for the sidewalk, throwing things on the sidewalk, picking them up.
>
> It was obvious that they disregarded the police commands to just remain there until she had an opportunity to investigate. That's what is obvious to me in the video.
>
> And accordingly, at CC 2013-09303, at the matter of the Commonwealth versus Will El, I find you guilty of disorderly conduct.

And at CC2013-09305, on the harassment count, I found Mr. Beyshaud El guilty of harassment.

(*Id.* at 3-4). Neither brother appealed Judge Sasinoski's findings. Judge Sasinoski's determination, therefore, is a valid and final judgment.

Lieutenant Kacsuta has had a number of complaints filed against her over her career. One of her City of Pittsburgh Police Department supervisors, Rashall Brackney ("Commander Brackney"), was deposed by Plaintiffs' counsel about complaints filed against Lieutenant Kacsuta. (Docket No. 116-6). Commander Brackney provided testimony about four complaints filed against Lieutenant Kacsuta. The first complaint concerning Lieutenant Kacsuta involved Ms. Nina Patel and Mr. Navin Bhambhwani and occurred on April 16, 2003. (*Id.* at 5). Lieutenant Kacsuta, then a sergeant, had stopped Ms. Nina Patel and Mr. Navin Bhambhwani for being parked in a no parking zone. (*Id.* at 7). During the stop, which lasted approximately forty-five minutes, she refused to allow Ms. Patel to use her cell phone to notify her childcare that she was not going to be able to pick up her children from child care on-time. (*Id.* at 8-9). Lieutenant Kacsuta also failed to complete a required "running sheet" which would have indicated that she had stopped the couple. (*Id.* at 7).

The second complaint concerning Lieutenant Kacsuta involved Mr. David Santa. (*Id.* at 11). Mr. Santa, who owned a club called the G-Spot, complained that on April 15, 2003 and May 10, 2003, he encountered Lieutenant Kacsuta, then a sergeant, yelling at valets at the G-Spot as well as two off-duty police officers who were working at the bar. (*Id.* at 12). Mr. Santa also asserted Lieutenant Kacsuta "allegedly threatened to break her foot off in his ass." (*Id.* at 11).

The third complaint concerning Lieutenant Kacsuta involved her treatment of Mr. Adam Balough in March 2006. (*Id.* at 36). An individual named Mr. Rager had called 911 and reported that someone suspicious was checking out vehicles, possibly with the intent to break into them;

Mr. Rager did not provide 911 or the police who followed up on the call with a description of the suspicious person. (*Id.* at 37-38). Lieutenant Kacsuta, then a sergeant, responded to the call and during the course of the investigation came across Mr. Balough. (*Id.* at 38). She stopped Mr. Balough based upon the fact that he was nervous and looking around. (*Id.*). Upon stopping him, she put him in a kneeling position on the wet ground, and waited for back up. (*Id.*). She then, at some point, requested permission to search him while he was still kneeling and compliant with her, and when he agreed, had another officer perform the search. (*Id.*). Lieutenant Kacsuta also patted down Mr. Balough prior to the full search. (*Id.* at 41).

Mr. Balough complained about his treatment by Lieutenant Kacsuta and the incident with Mr. Balough was investigated. (*Id.* at 37). The police investigator concluded that the complaint was unfounded, but Commander Brackney disagreed. (*Id.* at 37, 42-43). In Commander Brackney's opinion, at best Lieutenant Kacsuta could have had a mere encounter with Mr. Balough, and Lieutenant Kacsuta did not have any reason to have him kneel, be patted down, or to ask him to consent to be searched. (*Id.* at 39-42).

The fourth complaint concerning Lieutenant Kacsuta involved her asking a police officer who worked under her, Officer Tripoli, in 2007 to show some profession consideration and pull the ticket he wrote with respect to the mother of a fellow police officer Siara Lawniczak (this is the same Officer Lawniczak present during the stop of the El Brothers on July 2, 2013). (*Id.* at 30-31, 34). Officer Tripoli said the request intimidated him. (*Id.* at 31). Commander Brackney opined that the request was unethical. (*Id.* at 32).

Commander Brackney also testified that she had disagreed with Lieutenant O'Connor's recommendation in 2006 that Lieutenant Kacsuta, then a sergeant, be promoted to a lieutenant. (*Id.* at 17). Commander Brackney opined that at the time Lieutenant Kacsuta had too much of a

disciplinary history to be promoted. (*Id.*). Commander Brackney believed that Lieutenant Kacsuta had poor communication skills. (*Id.* at 19). Commander Brackney explained that there were times when the police department would receive an oral complaint or oral story about Lieutenant Kacsuta searching an individual, and the police paperwork would indicate that the person had not been searched. (*Id.* at 20). Also, Commander Brackney explained, there were times when the department would learn that Lieutenant Kacsuta had conducted a search, then someone would say that he did not consent to the search, and there would be validation that there was not paperwork or other evidence of consent to search. (*Id.* at 20-21). Commander Brackney also noted that Lieutenant Kacsuta's stated reasons for why she believed there was reasonable suspicion for believing a person was currently armed and/or dangerous were not being articulated or were being inadequately articulated to the point that she could not sign off on the forms or would often send them to the police department's legal adviser for review. (*Id.* at 21). Commander Brackney also submitted some of the stops Lieutenant Kacsuta was involved with to the legal advisor for review. (*Id.*). Nevertheless, despite these problems, Lieutenant Kacsuta was promoted to a lieutenant. (*Id.* at 22-23).

IV.    **Effect of the El Brothers' prior criminal proceedings before Judge Sasinoski upon the instant civil proceedings**

Based upon the events that provide the basis for this civil rights action, criminal proceedings were brought against the El Brothers in the Court of Common Pleas for Allegheny County which resulted in valid and final judgments being entered against them. The Defendants contend that their motion for summary judgment with respect to the Plaintiffs' § 1983 Fourth Amendment excessive force claims must be granted pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994): "[g]iven these convictions [for harassment and disorderly conduct] based on their conduct that prompted the Defendants' use of force, it was by definition reasonable for Officer Welling to

use his hands to force Will El back against the door and assure control of the situation, and for Officer Warnock to use a Taser followed Beyshaud El's punch. Any finding of excessive force under the circumstances would contradict and imply the invalidity of the prior criminal convictions." (Docket No. 107 at 15-16). In *Heck v. Humphrey*, the United States Supreme Court held:

> In order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a Federal Court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

*Heck,* 512 U.S. at 486–87.

Success in their § 1983 Fourth Amendment excessive force claims against the Defendants would not implicitly question the validity of the El Brothers' underlying criminal convictions for harassment (Beyshaud El) and disorderly conduct (Will El) in connection with their arrest on July 2, 2013 since the conduct of the individual officer Defendants at issue concerns the officers' use of force once the El Brothers' criminal conduct was complete. *See Olick v. Pennsylvania,* No. 16-4190, 2018 WL 3038387, at *2 (3d Cir. June 19, 2018) (concluding that *Heck* "does not automatically bar [the plaintiff's § 1983] claim of excessive force even though [he] has not demonstrated favorable termination of his harassment conviction. This is because law enforcement officers can 'effectuate[ ] a lawful arrest in an unlawful manner'") (quoting *Nelson v. Jashurek,* 109 F.3d 142, 145-46 (3d Cir. 1997)) (concluding that a finding that an officer used "substantial force" would not imply that the underlying arrest was unlawful and therefore, a plaintiff's § 1983 excessive force claim, wherein he asserted that the officer "effectuated a lawful arrest in an unlawful manner" through the use of excessive force, was not barred by *Heck*). Therefore, the

Defendants' motion for summary judgment is denied to the extent it is based upon the contention that the Plaintiffs' § 1983 Fourth Amendment excessive force claims against the Defendants are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994).

That said, while *Heck v. Humphrey* does not operate as an absolute bar to the El Brothers' § 1983 Fourth Amendment excessive force claims, because Judge Sasinoski's findings of guilt and the brothers' convictions have not been impaired,[2] the Plaintiffs cannot use this civil lawsuit as a means to challenge or contradict Judge Sasinoski's explicit findings/rulings or argue that such facts are "disputed" for purposes of the present motion and they are foreclosed from making any arguments that are inconsistent with same. *See Nelson,* 109 F.3d at 146 ("[I]f this case reaches trial, the trier of fact must be aware that Jashurek was justified in using 'substantial force' in arresting Nelson. Otherwise there would be a danger that in returning a general verdict against Jashurek predicated on a finding that he used excessive force, the trier of fact might base its verdict on findings not consistent with the conclusion the jury reached in the criminal case, *i.e.,* that Jashurek was justified in using 'substantial force' to arrest Nelson"). Thus, unlike the ordinary summary judgment case where we must view <u>*all*</u> of the evidence in the light most favorable to the non-movants, the Court must disregard the El Brothers' version of the events to the extent they contradict Judge Sasinoski's factual findings. *Id.*

Applying the doctrine of collateral estoppel to the case *sub judice* leads to the same result. Collateral estoppel provides that "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."

---

[2] Examples of ways to impair a conviction include reversal on direct appeal, expungement by executive order, a declaration of invalidity in a state proceeding, or the issuance of a writ of habeas corpus under 28 U.S.C. § 2254. *Heck*, 512 U.S. at 485-87.

*Jean Alexander Cosmetics v. L'Oreal USA*, 458 F.3d 244, 249 (3d Cir. 2006) (citing Restatement (Second) of Judgments § 27 (1982)). Collateral estoppel may be raised by the Court *sua sponte*. *Roe v. Pa. Game Comm'n*, 2018 WL 1296478, at *4 n. 5 (M.D. Pa. 2018). This doctrine "prevents a party who litigated an issue previously from rearguing that particular issue even if the other litigants were not party to that earlier proceeding." *James v. Heritage Valley Fed. Credit Union*, 197 F. App'x 102, 105 (3d Cir. 2006) (citing *Szehinskyj v. Atty. Gen. of the U.S.*, 432 F.3d 253, 255 (3d Cir. 2005)). As explained by the Court of Appeals in *James*, *supra*:

> A finding in a prior criminal proceeding may estop an individual from litigating the same issue in a subsequent civil proceeding. We must give the state court's judgment the same preclusive effect as would be given the judgment by a court of that state. Under Pennsylvania law, the elements of collateral estoppel are:
>
> (1) the issue decided in the prior adjudication was identical to the one presented in the later action; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom it is asserted had a full and fair opportunity to litigate the issue in question in a prior action.

*James*, 197 F. App'x at 105 (citations omitted). Pennsylvania preclusion law is applicable here because it is the judgment of the state court that would have preclusive effect. *R&J Holding Co. v. Redevelopment Auth. of Cty. of Montgomery*, 670 F.3d 420, 426-27 (3d Cir. 2011) (quotation omitted). As all four of the elements of collateral estoppel are present in this case, the El Brothers are precluded from claiming that any of Judge Sasinoski's above-quoted findings of fact, or other legal conclusions, which were essential to his determination of Beyshaud El's conviction for harassment and Will El's conviction for disorderly conduct in their criminal cases are "disputed" for purposes of the present motion or otherwise. *See Crawford v. Frimel*, 337 F. App'x 211, 214 (3d Cir. 2009) (plaintiff was precluded from relitigating the issue of whether there was probable cause for his arrest and the search of his apartment in a *Bivens* claim when he had previously litigated the issue during the course of prior criminal proceedings, by way of a motion to suppress);

*S.E.C. v. Graulich*, Civ. No. 09-4355, 2013 WL 3146862, at *4 (D.N.J. June 19, 2013) (defendant was collaterally estopped from challenging facts giving rise to civil liability because he pled guilty to criminal fraud charges stemming from the same conduct; "[Defendant] is estopped from denying all of the issues that were necessarily admitted in the plea").

V.    **Discussion**

A.    **Relevancy of the Controlled Substance, Drug, Device and Cosmetic Act – Schedule I Controlled Substances, Act of Jun. 23, 2011, P.L. 36, No. 7 to Defendants' motion for summary judgment**

In responding to the Defendants' motion for summary judgment, the El Brothers challenge the constitutionality of the Controlled Substance, Drug, Device, and Cosmetic Act – Schedule I Controlled Substances, Act of Jun. 23, 2011, P.L. 36, No. 7, which the Defendants attached to their supplemental brief in support of their motion for summary judgment, (Docket No. 130-1), as applied in the instant case. *See* Docket No. 132 at 2 ("Plaintiffs assert that this provision is incomprehensible and offers no fair warning of what is legal or not"); *id.* at 3 ("[t]he above-quoted law fails to set forth a crime in a manner that an ordinary person can understand and predict what conduct is prohibited. As such, it simply violates the due process rights of Plaintiffs to suggest that it could serve as the predicate for the intrusive, lengthy, and aggressive seizure of which they were subjected."); *id.* at 6 ("Plaintiffs challenge the Commonwealth's assertion that 'synthetic marijuana' was illegal prior to the day of the subject incident, given that 'synthetic marijuana' has no meaningful definition and the scientific listing of proscribed chemical compounds in the cited law provided a meaningless admonition to either Plaintiffs or the police, providing no certainty as to what was or was not illegal."). This statutory provision amended the Controlled Substance, Drug, Device, and Cosmetic Act, in relevant part, to include as Schedule I controlled substances "synthetic cannabinoids or any material, compound, mixture or preparation which contains any

quantity of the following substances, including their analogues, congeners, homologues, isomers, salts, and salts of analogues, congeners, homologues and isomers, as follows: . . . ." Act of June 23, 2011, P.L. 36, No. 7. Possession of "synthetic marijuana" by the El Brothers was the original basis for Lieutenant Kacsuta stopping the Plaintiffs.

Plaintiffs' Second Amended Complaint alleges claims against the Defendants based upon the El Brothers' rights, under the Fourth Amendment to the United States Constitution, to be free from excessive force by the individual defendant Officers. Accordingly, the constitutionality of the Controlled Substance, Drug, Device, and Cosmetic Act, as applied in the instant case, is not, as a matter of law, a basis for denying the Defendants' motion for summary judgment.

### B. The Defendants' motion for summary judgment as to the Plaintiffs' § 1983 Fourth Amendment excessive force claims against the individual officer Defendants

The Defendants contend that their motion for summary judgment should be granted as to each of the Plaintiffs' § 1983 excessive force claims against the individual officer Defendants because: (1) they did not engage in excessive force with respect to the El Brothers; and (2) if excessive force was used, they are entitled to qualified immunity.

In *Santini v. Fuentes*, No. 17-2890, 2018 WL 3408265 (3d Cir. July 12, 2018), the appellate court recently reiterated the general inquiry for determining whether an official is entitled to qualified immunity at the summary judgment stage of a case:

> "[t]he doctrine of qualified immunity shields government officials who perform discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Santini [v. Fuentes]*, 795 F.3d [410, 417 (3d Cir. 2015)] (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). We perform a two-step inquiry to determine a government official's entitlement to summary judgment on grounds of qualified immunity: (1) "whether the facts — taken in the light most favorable to the nonmoving party — show that a government official violated a constitutional right;" and (2) "whether that right was clearly established at the time of the official's actions." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

*Santini v. Fuentes*, No. 17-2890, 2018 WL 3408265, at *2 (3d Cir. July 12, 2018). More specifically, with respect to whether a plaintiff has established that a defendant violated his constitutional right to be free from excessive force, in *Kisela v. Hughes,* the United States Supreme Court recently explained:

> In *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Court held that the question whether an officer has used excessive force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Ibid. And "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id., at 396–397, 109 S.Ct. 1865.

*Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). *See also Estate of Smith v. Marasco,* 430 F.3d 140, 149-50 (3d Cir. 2005) (explaining that in determining whether the use of force is objectively reasonable, the following factors need to be considered: "'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight ... [whether] the physical force applied was of such an extent as to lead to injury ... the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time'") (quoting *Sharrar v. Felsing*, 128 F.3d 810, 821-22 (3d Cir. 1997).

With respect to determining whether any right allegedly violated was clearly established at the time of the defendant's conduct, the *Kisela* Court further explained:

Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. ——, ——, 137 S.Ct. 548, 551, 196 L.Ed.2d 463 (2017) (per curiam) (alterations and internal quotation marks omitted). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam ).

Although "this Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White*, 580 U.S., at ——, 137 S.Ct., at 551 (internal quotation marks omitted). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *Ibid.* (internal quotation marks omitted). This Court has "'repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.'" *City and County of San Francisco v. Sheehan*, 575 U.S. ——, ——, 135 S.Ct. 1765, 1775–1776, 191 L.Ed.2d 856 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)); *see also Brosseau, supra*, at 198–199, 125 S.Ct. 596.

"[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. ——, ——, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (per curiam) (internal quotation marks omitted). Use of excessive force is an area of the law "in which the result depends very much on the facts of each case," and thus police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue. *Id.*, at ——, 136 S.Ct., at 309 (internal quotation marks omitted and emphasis deleted). Precedent involving similar facts can help move a case beyond the otherwise "hazy border between excessive and acceptable force" and thereby provide an officer notice that a specific use of force is unlawful. *Id.*, at ——, 136 S.Ct., at 312 (internal quotation marks omitted).

"Of course, general statements of the law are not inherently incapable of giving fair and clear warning to officers." *White*, 580 U.S., at ——, 137 S.Ct., at 552 (internal quotation marks omitted). But the general rules set forth in "*Garner* and *Graham* do not by themselves create clearly established law outside an 'obvious case.'" *Ibid*. Where constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness. An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. ——, ——, 134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056

(2014). That is a necessary part of the qualified-immunity standard, and it is a part of the standard that the Court of Appeals here failed to implement in a correct way.

*Kisela*, 138 S. Ct. at 1152–53.

## 1. Officer Welling

The Defendants contend that their motion for summary judgment should be granted as to the Plaintiffs' § 1983 excessive force claim against Officer Welling because the force used with respect to Will El was not excessive given that Will El's actions of disobeying the command to stay seated, standing, and taking a step towards the officers were threatening and thus, Officer Welling did not have to take a wait and see approach before gaining Will El's compliance through physical force. The Court disagrees. Viewing the facts in the light depicted by the videotape, Will El's act of standing up and taking one or two small steps towards Lieutenant Kacsuta, located a few feet away, undertaken during the course of an investigatory stop first for suspicion of possession of synthetic marijuana and then for illegal sale/possession of cigarettes, was not performed in a threatening manner. Accordingly, a reasonable factfinder could conclude that in light of Will El's conduct, Officer Welling's act of grabbing Will El by wrist and neck and slamming him into the wall of the vacant storefront and on to the pavement was unreasonable and constituted an excessive use of force that violated Will El's rights under the Fourth Amendment. *See Thornton v. City of Macon*, 132 F.3d 1395, 1400 (11th Cir. 1998) (defendant officers' motion for summary judgment on excessive force claims denied where neither plaintiff was suspected of having committed a serious crime, neither posed an immediate threat to anyone, and neither actively resisted arrest, and yet, in arresting the plaintiffs, one plaintiff was grabbed and wrestled to the ground and the other plaintiff was thrown on the hood of the patrol car before being handcuffed).

The Court further finds that it was clearly established on July 2, 2013 that an individual who during an investigatory stop for a minor offense, stands up and takes one or two small steps towards a police officer, standing a few feet away, in a non-threatening manner, had the right to be free from the use of excessive force by police. *See Smith v. City of Troy, Ohio*, 874 F.3d 938, 945 (6th Cir. 2017) (appellate court denied qualified immunity on an excessive force claim when defendant officer took plaintiff to the ground with a leg sweep and landed on top of the plaintiff where there was little in the record to suggest that the plaintiff had committed any crime, even a minor one, the plaintiff had told officer he was sick and having a seizure, there was no testimony the officer believed the plaintiff was a safety threat, and the officer never told the plaintiff he was under arrest, even though the plaintiff had not complied with the officer's order to return to his car and had pulled his arm away from the officer; court concluded it was well established at the time of the incident that a non-violent, non-resisting, or only passively resisting suspect who is not under arrest has a right to be free from an officer's use of force) (citing *Shreve v. Jessamine Cty. Fiscal Court*, 453 F.3d 681, 687 (6th Cir. 2006); *Hanks v. Rogers*, 853 F.3d 738, 747 (5th Cir. 2017) (qualified immunity was denied to police officer who applied a "half spear" to a plaintiff he had stopped for a traffic violation who subsequently did not follow instructions, including to "go to [his] knees," and took a small step while his hands were behind his back, because "clearly established law demonstrated that an officer violates the Fourth Amendment if he abruptly resorts to overwhelming physical force rather than continuing verbal negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most, passive resistance, and whom the officer stopped for a minor traffic violation") (citing *Deville v. Marcantel*, 567 F.3d 156, 167-69 (5th Cir. 2009) (finding qualified immunity inappropriate at summary judgment when officer making a minor traffic stop had overpowered an individual who displayed, at most, passive

resistance, and presented no safety threat or flight risk); *Montoya v. City of Flandreau*, 669 F.3d 867, 873 (8th Cir. 2012) (appellate court reversed district court's grant of summary judgment on qualified immunity grounds, reasoning, "[a]ssuming once again [plaintiff's] story is true, the contours of the right at issue were sufficiently clear to inform a reasonable officer in Officer Hooper's position it was unlawful for him to perform a 'leg sweep' and throw to the ground a nonviolent, suspected misdemeanant who was not threatening anyone, was not actively resisting arrest, and was not attempting to flee."); *Weather v. City of Mount Vernon,* 474 F. App'x 821, 824 (2d Cir. 2012) (appellate court concluded that defendant officer was not entitled to qualified immunity on excessive force claim where the plaintiff "was breaking no law, was not resisting arrest, and was not placing himself or others in danger," concluding "[n]o reasonable officer would believe that 'twisting Mr. Weather's arm behind his back and pushing or shoving him into the brick wall outside the school' was a lawful use of force in this circumstance"); *Thornton*, 132 F.3d at 1400 ("[U]nder these circumstances [where neither plaintiff was suspected of having committed a serious crime, neither posed an immediate threat to anyone, and neither actively resisted arrest,] the officers were not justified in using *any* force, and a reasonable officer thus would have recognized that the forced used was excessive."). *Cf. Santini*, 2018 WL 3408265, at *3 (Third Circuit court concluded that the plaintiff's right to be free from the use of force, including the use of pepper spray and strikes from nightsticks, as a non-suspect witness who walked away from an investigatory discussion, and who admitted he (1) unintentionally did not comply with an officer's request to keep his hands visible, and (2) resisted arrest was not clearly established as of February 3, 2009, and therefore, officer was entitled to qualified immunity with respect to plaintiff's § 1983 excessive force claim). Therefore, Officer Welling is not entitled to qualified immunity with

respect to the Plaintiffs' § 1983 Fourth Amendment excessive force claim against him and the Defendants' motion for summary judgment on said claim against Officer Welling shall be denied.

### 2. Officer Warnock

The Defendants contend that their motion for summary judgment should be granted with respect to the Plaintiffs' § 1983 excessive force claim against Officer Warnock because Officer Warnock's tasing Beyshaud El, undertaken in response to Officer Warnock observing Beyshaud El's attempting to punch Officer Welling, was reasonable, and not excessive, force. The Court disagrees. Viewing the facts in the light depicted by the videotape, while Beyshaud El clearly attempted to punch Officer Welling,[3] a reasonable factfinder could conclude that Officer Warnock's tasing Beyshaud El, without first using lesser force, was unreasonable, excessive force.

Having determined that a reasonable factfinder could conclude that Officer Warnock engaged in excessive force when he tased Beyshaud El in response to seeing Beyshaud El attempting to punching Officer Welling, the Court further finds that it was not clearly established on July 2, 2013 that a police officer could not use a taser to subdue an individual who, while being stopped for investigatory purposes, was observed attempting to punch another police officer. The Court also finds that this is not one of "the rare 'obvious case[s],' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 138 S.Ct. at 590 (quotations omitted). Therefore, although a reasonable factfinder could conclude that Officer Warnock used excessive force against Beyshaud El, Officer Warnock, nevertheless, is entitled to qualified immunity with respect to the Plaintiffs' § 1983 Fourth Amendment excessive force claim against him. Accordingly, the Defendants' motion for

---

[3]*See* Dash Cam Video at 13:47:07.

summary judgment on the Plaintiffs' § 1983 Fourth Amendment excessive force claim against Officer Warnock shall be granted.

### 3. Lieutenant Kacsuta

The Plaintiffs' § 1983 excessive force claim against Lieutenant Kacsuta is based upon her failure to intervene to stop Officers Welling and Warnock's use of excessive force upon the El Brothers. "[T]he facts are disputed as to whether Officers Warnock and Welling [were] using excessive force, and whether Lt. Kacsuta has a realistic and reasonable opportunity to prevent the other two officers from so acting. The events surrounding Will and Beyshaud El's arrests did not occur so quickly as to preclude Lt. Kacsuta's duty to intervene." (Docket No. 116 at 19) (citing *Stewart v. Moll*, 717 F. Supp.2d 454, 463 (E.D. Pa. 2010); *Baker v. Monroe Tp.,* 50 F.3d 1186, 1194 (3d Cir. 1995).

In *Smith v. Mensinger*, 293 F.3d 641 (3d Cir. 2002), the appellate court explained:

Courts have held that a police officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force, even if the excessive force is employed by a superior. "If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983." *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir.1986); accord *Putman v. Gerloff*, 639 F.2d 415, 423 (8th Cir.1981); *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir.1972). However, an officer is only liable if there is a realistic and reasonable opportunity to intervene. See *Clark*, 783 F.2d at 1007 (instructing the district court upon remand to determine whether the officer was in a position to intervene); *Brishke*, 466 F.2d at 11 (liability for failure to intervene exists only if the beating occurred in the officer's presence or was otherwise within his knowledge); *Putman*, 639 F.2d at 423–24 (liability exists only if the non-intervening officer saw the beating or had time to reach the offending officer).

*Smith,* 293 F.3d at 650-51. In determining whether Lieutenant Kacsuta had a reasonable opportunity to intervene in Officer Welling and Officer Warnock's excessive use of force, the Court must consider "factors such as the 'temporal length of the alleged assault, the proximity of

the non-intervening officer to the alleged assault, the ability of the non-intervening officer to perceive and/or hear the alleged assault,' among others." *Estep v. Mackey*, Civ. No. 3:11-0207, 2013 WL 6533350, at *6 (W.D. Pa. Dec. 13, 2013) (quoting *Armbruster v. Marguccio*, Civ. No. 3:05–0344, 2006 WL 3488969, at *8 (W.D. Pa. Dec.4, 2006)); *Yarnall v. Mendez*, 509 F.Supp.2d 421, 433 (D. Del. 2007) (citing *Riley v. Newton*, 94 F.3d 632, 635 (11th Cir.1996)) (other citation omitted).

Viewing the facts in the light depicted by the videotape, the Court finds, with respect to Officer Warnock's tasing Beyshaud El, that a reasonable factfinder could not conclude that Lieutenant Kacsuta had a reasonable opportunity to intervene in Officer Warnock's use of excessive force towards Beyshaud El and failed to do so. Officer Warnock's act of tasing Beyshaud El was quick, five seconds, and without warning. *See O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) (summary judgment granted as to claim that defendant was liable for use of excessive force by failing to intercede where there is insufficient evidence to permit a jury reasonably to conclude that the defendant's failure to intercede was a proximate cause of the beating in that the three blows were struck in such rapid succession that the defendant had no realistic opportunity to attempt to prevent them); *Ewing v. Cumberland Cty*, 152 F.Supp.3d 269, 309-310 (D.N.J. 2015) (granting summary judgment in favor of police officer on failure to intervene in excessive force claim where defendant witnessed another officer forcefully push the plaintiff's face into the door of a processing room "because even assuming a constitutional violation had occurred, no reasonable jury could find that there was a reasonable opportunity for [defendant] to intervene before Plaintiff was mistreated by [other officer]. [Defendant] did not know that [other officer] would push Plaintiff into the door, and nothing in the record suggests that [defendant] knew [other officer] was about to use excessive force when he took Plaintiff by the arm to escort him out of

the room. The evidence of record describes an instantaneous, perhaps impulsive shove by [other officer], to which [defendant] was only a witness. Even if [defendant] had wanted to intervene, the evidence is insufficient as a matter of law to show that he had any opportunity to do so"); *Buchanan v. West Whiteland Tp.*, Civ. No. 08-462, 2009 WL 54949, at *4 (E.D. Pa. Jan. 7, 2009) (court granted motion to dismiss plaintiff's duty to intervene claim after viewing the videotape of a traffic stop because there was no realistic possibility that the defendant officers could have intervened to prevent the other officer from using a taser on the plaintiff).

With respect to Officer Welling's physical altercation with Will El, however, viewing the facts in the light depicted by the videotape, a reasonable factfinder could conclude that Lieutenant Kacsuta, mere feet away from Officer Welling and Will El as she passively watched Officer Welling grab Will El by his wrist and neck, slam him into the wall and on to the pavement, could have intervened in the altercation and elected not to do so (indeed Lieutenant Kacsuta stepped away from the altercation at one point). Moreover, the Court finds that Lieutenant Kacsuta is not entitled to qualified immunity with respect to the Plaintiffs' § 1983 excessive force claim against her because it was clearly established on July 2, 2013, that when a fellow officer employs excessive force during an arrest or investigatory stop, failing to intervene violates the suspect's constitutional rights. *See Smith*, 293 F.3d at 650 ("Courts have held that a police officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force"); *Garbacik v. Janson*, 111 F. App'x. 91, 94 (3d Cir. 2004) (citing courts of appeals' cases from other jurisdictions that found officer had a duty to prevent the use of excessive force by another officer).

Accordingly, the Defendants' motion for summary judgment on the Plaintiffs' § 1983 excessive force claim against Lieutenant Kacsuta shall be denied.

**C. The Defendants' motion for summary judgment as to the Plaintiffs' § 1983 *Monell* municipal liability claim against the City of Pittsburgh**

The Defendants argue that summary judgment must be entered on the Plaintiffs' § 1983 *Monell* municipal liability claim against the City because: (1) the individual officer Defendants did not violate the El Brothers' constitutional rights and (2) the evidence produced by the Plaintiffs predates the incident in question by years and does not involve conduct that resulted in similar constitutional violations. The Plaintiffs' *Monell* claim against the City is based upon its alleged failure to train, supervise, and reprimand Lieutenant Kacsuta for numerous problems since 2000. *See* Docket No. 116 at 27 ("Plaintiffs allege that the excessive use of force they were subjected to was the result of a failure of the City of Pittsburgh to intervene into Lt. Kacsuta's long and documented history of violating police department policies, violating suspects' constitutional rights, and interacting with citizens in a belligerent and abusive manner.").

Municipalities and other local governmental units "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief." *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978). "But, under § 1983, local governments are responsible only for 'their own illegal acts.'" *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citations omitted, emphasis in original). "They are not vicariously liable under § 1983 for their employees' actions." *Id.* Rather, a plaintiff must establish the existence of a municipal policy or custom that caused the alleged violation of his constitutional rights. *Monell*, 436 U.S. at 694 (1978).

Policy is made when a 'decisionmaker possess[ing] final authority to establish a municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)). State law determines whether an individual is a policymaker, i.e., an official who has final, unreviewable discretion to make a decision or take an action. *Id.* at 1481 (citing *City of*

*St. Louis v. Praprotnik*, 485 U.S. 112, 142 (1988)). "A course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanent and well settled' as to virtually constitute law." *Andrews*, 895 F.2d at 1480 (quoting *Monell*, 436 U.S. at 690). Custom may also be established by evidence of knowledge and acquiescence. *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996); *see also Natale v. Camden Cty. Corr. Fac.*, 318 F.3d 575, 584 (3d Cir. 2003) (explaining "a policy or custom may also exist where the policymaker has failed to act affirmatively at all, though the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need").

"Where the policy [or custom] concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to deliberate indifference to the rights of persons with whom the employees will come into contact." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014) (citations and internal marks omitted). "Once a § 1983 plaintiff identifies a municipal policy or custom, he must 'demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged.'" *Berg v. Cty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000) (quoting *Bd. of Cty. Com'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997)). In other words, the deficiency in training or supervision must have actually caused the constitutional violation. *Thomas*, 749 F.3d at 223. The Supreme Court has observed that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61.

*Monell* liability is ordinarily established by showing a pattern of constitutional violations, *see Brown*, 520 U.S. at 407. The Supreme Court, however, has recognized that where a violation

of federal rights is a "highly predictable consequence" of an inadequate municipal policy or custom in a situation that is likely to recur, municipal liability may attach upon a single application of that custom. *Id*. at 409-10. For example, typically, in order to establish that a failure to train constitutes deliberate indifference, a plaintiff must demonstrate a pattern of similar constitutional violations by untrained employees that shows the municipality was on notice of a deficiency in its training programs. *Thomas*, 749 F.3d at 223 (quotation omitted). A single incident, however, may establish failure-to-train liability where "the need for training can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights." *Id*. (quotation omitted); *see also Connick*, 563 U.S. at 64 (a single incident may trigger municipal liability where unconstitutional consequences for failure to train are "patently obvious"). Further, to allege a failure to supervise claim under *Monell*, the Third Circuit has required a plaintiff to show that the municipality has "contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate." *Montgomery v. De Simone*, 159 F.3d 120, 127 (3d Cir. 1998) (citing *Bonenberger v. Plymouth Tp.*, 132 F.3d 20, 25 (3d Cir. 1997)).

While the City's failure to adequately train, supervise, and/or reprimand Lieutenant Kacsuta can be considered a custom or policy if said failure amounted to deliberate indifference to the rights of the El Brothers, even viewing the evidence of record in the light most favorable to the Plaintiffs as the non-moving party, the Court finds that the Plaintiffs have failed to submit sufficient evidence to support a *Monell* failure to train, supervise, or reprimand claim against the City because a reasonable factfinder could not conclude that the City's failure to train, supervise, and/or reprimand Lieutenant Kacsuta was the moving force behind the El Brothers' constitutional

injuries. The Court so finds because even viewing the evidence of record in the light most favorable to the Plaintiffs, the complaints submitted to the City concerning Lieutenant Kacsuta that were made part of the record[4] all occurred six to ten years prior to the July 2, 2013 encounter with the El Brothers and none of these past incidents involved Lieutenant Kacsuta's use of excessive force, her failure to intervene in another officer's use of excessive force, or any other conduct similar in scope to the conduct that caused the El Brothers' injuries. Nor does Commander Brackney's testimony create a genuine issue of material fact with respect to the proximate cause element of Plaintiffs' *Monell* claim against the City. While Commander Brackney clearly opined in 2003 that Lieutenant Kacsuta should not have been promoted because she was experiencing serious problems in numerous areas of her job, none of the areas of concern involved the use of excessive force, failure to intervene in the use of excessive force, or other conduct similar in scope to the conduct that caused the El Brothers' injuries. Accordingly, because a reasonable jury could not find in favor of the Plaintiffs and against the City on the Plaintiffs' *Monell* § 1983 municipal liability claim against the City, the Defendants' motion for summary judgment on the Plaintiffs' *Monell* § 1983 municipal liability claim against it must be granted.

---

[4] Evidence was submitted concerning complaints filed by: (1) Ms. Patel/Mr. Bhambhwani (for rude and uncivil behavior in April 2003); (2) Mr. Santa (for rude and uncivil behavior in April and May 2003); (3) Mr. Balough (for improper seizure and search in March 2006); and (4) Officer Tripoli (for intimidation of subordinate in 2007). (Docket No. 116-6 at 5, 7-9, 11-12, 32, 34-36, 38, 41-43). While Plaintiffs argue about the relevance of other alleged incidents involving Lieutenant Kacsuta, they did not submit any evidence of these incidents into the record. Specifically, in deciding the Defendants' motion for summary judgment, the Plaintiffs did not submit evidence in support of, and therefore, the Court cannot take into consideration the Plaintiffs' arguments with respect to: (1) an August 22, 2000 complaint allegedly filed by Brian White against Lieutenant Kacsuta; (2) a March 7, 2000 complaint allegedly by Lynn McCormick against Lieutenant Kacsuta; (3) a January 13, 2003 complaint allegedly filed by Jim Middleby against Lieutenant Kacsuta; (4) a March 2006 complaint allegedly filed by Elizabeth White against Lieutenant Kacsuta; (5) an incident allegedly involving Lieutenant Kacsuta and Joseph Marsaglia; (6) a February 20, 2005 memorandum allegedly written by Lieutenant O'Connor concerning six cases brought against Lieutenant Kacsuta between July 2004 and February 2005; (7) a May 26, 2003 Memorandum Commander Brackney allegedly wrote to Commander Paul Donaldson concerning recent complaints received about Lieutenant Kacsuta, what Brackney had done so far to correct the problems, what else Brackney thought needed to be done, and additional areas where Brackney opined Kacsuta was experiencing difficulties; and (8) retraining Lieutenant Kacsuta allegedly was required to complete. (Docket No. 116 at 22-27).

**D.  The Defendants' motion for summary judgment on the Plaintiffs' state law assault and battery claims against the individual officer Defendants**

The Defendants move for summary judgment on the Plaintiffs' state law assault and battery claims against the individual officer Defendants on the basis that for all of the reasons "why no excessive force was used in this incident, no assault and battery was committed by any Defendant, either." (Docket No. 107 at 20). While the Plaintiffs did not originally respond to this part of the Defendants' motion for summary judgment, in their sur-reply brief in opposition to the Defendants' motion for summary judgment, the El Brothers contend, "[t]he assault and battery arise from the same kernel of factual allegations as the excessive force claim. . . . Both parties have presented significant argument regarding their positions on the officers' use of force and whether it was excessive; the same arguments and facts relate to Plaintiffs' state law claims." (Docket No. 125 at 6-7).

For the reasons set forth *supra*, a reasonable factfinder could conclude that the force used by Officers Welling and Warnock with respect to the El Brothers was excessive. Accordingly, the Defendants' motion for summary judgment as to the Plaintiffs' assault and battery claims against Officers Welling and Warnock shall be denied. *See Minor v. Cumberland Twp.,* 258 F. Supp.3d 518, 531-32 (W.D. Pa. 2017) ("[a] police officer may be held liable for assault and battery when the force used in making an arrest is unnecessary or excessive. As the Court has found that genuine questions of fact and credibility exist as to [the plaintiff's] excessive force claims, similar questions of fact and credibility exist as to her assault and battery claims") (citations omitted). To the contrary, because the Plaintiffs' assault and battery claims against Lieutenant Kacsuta are not based upon her actual use of excessive force upon either one of the El Brothers, the Defendants' motion for summary judgment on the Plaintiffs' assault and battery claims against Lieutenant Kacsuta shall be granted.

## VI.     Conclusion

For the reasons set forth above, the Defendants' motion for summary judgment is granted as to the Plaintiffs' § 1983 Fourth Amendment excessive force claim against Defendant Warnock, the Plaintiffs' *Monell* § 1983 municipal liability claim against the City, and the Plaintiffs' state law assault and battery claims against Lieutenant Kacsuta, and is otherwise denied. An appropriate Order will follow.


August 3, 2018                                         By the Court:

                                                      s/Nora Barry Fischer
                                                      Nora Barry Fischer
                                                      United States District Judge